**Paul S. DOPP, Plaintiff,**

v.

**HTP CORPORATION; New Horizons, Inc.; Dorado Rockwood Corp.; Island Resorts Holdings, S.A.; Jay A. Pritzker; Richard L. Schulze, Defendants.**

**Jay A. PRITZKER, Plaintiff,**

v.

**Bob YARI; Paul S. Yari; Paul S. Dopp; Baird, Patrick & Company, Inc.; Lincoln Realty, Inc., Defendants.**

Civ. Nos. 88–1420 (JP), 92–2825 (JP).

United States District Court,
D. Puerto Rico.

Sept. 9, 1993.

---

Rubén T. Nigaglioni, Ledesma, Palou & Miranda, Hato Rey, P.R., for plaintiff in Civ. No. 88–1420(JP).

Salvador Antonetti Zequeira, Fiddler, González & Rodríguez, Héctor Meléndez Cano, Trías, Acevedo & Otero, San Juan, PR, for defendant in Civ. No. 88–1420(JP).

Salvador Antonetti, Zequeira, Fiddler, González & Rodríguez, San Juan, PR, for plaintiff in Civ. No. 92–2825(JP).

Rubén T. Nigaglioni, Ledesma, Palou & Miranda, Jorge Bermúdez Torregrosa, Cuevas Kuinlam & Bermúdez, Roberto Boneta, Muñoz, Boneta, González, Arbona, Benítez & Peral, Hato Rey, PR, for defendant in Civ. No. 92–2825(JP).

### OPINION & ORDER

PIERAS, District Judge.

The Court has before it several waves of briefs in these two related actions which address a host of issues—but this litigation is no stranger to difficult and protracted legal battles. In reviewing the appeals that arose out of its first jury trial, Judge Selya, writing for a panel of the First Circuit, characterized the task they faced as an "odyssey." *Dopp v. HTP Corp.*, 947 F.2d 506, 509 (1st Cir.1991). Since that time, the litigation has become even more complicated, primarily because of the filing of the second action, which addresses the propriety and effect of a series of sales of financial interests in the plaintiff's potential recovery. As a result, the Court now finds itself poised like Homer's mariner at

the mouth of the straits guarded by Scylla and Charybdis, hoping to emerge with considerably less damage to its crew.[1]

## I. Background

On May 9, 1984, Code Hospitality, a corporation wholly owned by Paul S. Dopp, entered into a Purchase Agreement to acquire all the stock or assets of a corporation called the Dorado Beach Hotel Corporation (hereinafter "DBHC"). When this Agreement was signed, DBHC owned approximately 1,000 acres of ocean front property on the north coast of Puerto Rico, in Dorado, including two resort hotels—the Dorado Beach and the Cerromar—and four golf courses. The Purchase Agreement provided Code with the option to acquire all the stock or assets of DBHC for $40.5 million by December 3, 1984. To secure performance under the Purchase Agreement, Dopp pledged a $2 million letter of credit.

In November 1984, after fruitless discussions with a host of financial institutions and prospective investors, Dopp approached Jay Pritzker, the chairman of Hyatt Corporation. By telephone, they entered into an Oral Contract pursuant to which Pritzker agreed to provide all the funds needed to exercise Code's obligations under the Purchase Agreement. In exchange, Pritzker was to receive an 80 percent interest in a corporation—later called HTP Corporation—that would be formed to acquire DBHC's stock. In addition, the Oral Contract provided that a Hyatt affiliate would be awarded a long-term contract to manage the hotels. Dopp and a partner, in turn, were to receive the

remaining 20 percent of the shares of HTP and would be repaid all monies that they had expended in anticipation of the closing. Several days later, and on the eve of the date the option to purchase the Hotels was to expire, Dopp, Pritzker (represented by Richard Schulze) and Dopp's partner met to draft the necessary agreements to implement the Oral Contract. At this time, as determined by a jury, Pritzker breached the Oral Contract by conditioning his funding of the deal, and the execution of the same, upon the inclusion of a clause which granted him the option to buy out Dopp and his partner for $1 million dollars at any time during the next 10 years.[2] The jury found that these actions by Pritzker constituted serious deceit or duress.

Duress, which is known in the Civil Code as intimidation, exists when one of the contracting parties is inspired with a reasonable and well-grounded fear of suffering an imminent and serious injury to his property. 31 L.P.R.A. § 3406. Deceit, which is roughly translated as "dolo" in the Spanish language, may be found when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which he would not otherwise have made. 31 L.P.R.A. § 3408. These doctrines have their counterparts in the common law. For example, under the common law "deceit" is defined as "[a] fraudulent and cheating misrepresentation, artifice, or device used by one or more persons to deceive and trick another, who is ignorant of the true facts, to the prejudice and damage of the party imposed upon." *Black's Law Dictionary* (Rev'd 4th ed. 1968) at 493. The simi-

1. In *The Odyssey*, Homer personified Scylla as a female monster with six heads who, perched atop a rock on the eastern side of the straits, would devour everything that came within her reach, a half dozen at a time. He depicted Charybdis as a whirlpool off the western side of the straits which, if not properly regarded, would consume his entire ship. The goddess Circe instructed Odysseus: "Ah, shun the horrid gulf! by Scylla fly. 'Tis better six to lose, than all to die." *The Odyssey,* Book XII, lines 137–38.

2. On December 3, 1984, the parties executed two separate contracts. Through the first, Code assigned to HTP its rights under the Purchase Agreement. In turn, Pritzker agreed to assume Dopp's obligations under the $2 million letter of

credit and to pay him a consulting fee. Through the second, called the Stock Subscription Agreement ("SSA"), HTP's stock was to be distributed in the following way: 80 percent to Pritzker through an entity designated by him, 12 percent to Dopp, and 8 percent to Dopp's partner. The SSA contained the buyout clause granting Pritzker the option to buy out Dopp and his partner for $1 million dollars at any time within the next ten years. The Purchase Agreement was closed on December 4, 1984. HTP acquired DBHC's stock and Pritzker supplied the funds. Thus, HTP became the owner of DBHC, which in turn owned the Dorado and Cerromar properties. Thereafter, the $2 million letter of credit was cancelled and Dopp and his partner were reimbursed the $710,000 that they had advanced for expenses.

larity in the causes of action is commensurate with their common roots in Roman law. Both require a showing of an act or omission which is something more than simple negligence but also something less than fraud. This cause of action lies right between a tort and a criminal fraud. In finding that Pritzker had committed deceit ("dolo") under the facts of this case, the jury in effect determined that Pritzker had abused his superior economic position to procure illegally Dopp's concessions regarding the buyout option; Pritzker also drove Dopp to a point of no return that left him no other alternative but to accept Pritzker's proposition in breach of his previous oral promise. In short, that he had breached accepted standards of business ethics codified into the law of the land.[3]

The Court entered judgment based on the jury's verdict and a later determination that Dopp was entitled to an order annulling the buyout option. Ten appeals were filed. The First Circuit remanded the case, Civil Case No. 88–1420 (JP) (hereinafter "the Main Case"), with its liability verdict intact but stripped of its remedies.[4] The circuit court directed that a second jury trial be held to determine the amount of Dopp's damages under three alternative legal theories and that he then be afforded the opportunity to make an election from among these remedies. The second trial commenced on March 8, 1993, with the jury rendering its verdict on March 27, 1993.[5] After the trial, Dopp elected as his remedy the resolution of the Oral Contract. The Court now has before it post-trial motions filed by both sides attacking various aspects of the jury's verdict. In addition, the Court has before it memoranda of law filed by both sides regarding Dopp's election of remedies.

Meanwhile, swirling below this rocky terrain is Civil Case No. 92–2825 (JP) ("the Litigated Credits Case"), in which Pritzker has sought to extinguish some or all of the recovery to be obtained by Dopp on grounds that Dopp sold stakes in his recovery in the Main Case which may be redeemed by Pritzker under Article 1425 of the Puerto Rico Civil Code. The Court entered partial summary judgment in the Litigated Credits Case on April 19, 1993, declaring that Article 1425 applies to the agreements through which Dopp sold stakes in his recovery. The Court now has before it several motions attacking the Court's entry of partial summary judgment. Also before the Court are issues addressed during a Non–Jury Trial held on June 10, 1993, to determine the rights of the various parties pursuant to Article 1425.

## II. Pritzker's Motion to Consolidate

Before sailing through these choppy waters, the Court must first address briefly a Motion to Consolidate filed by Pritzker in the Main Case on April 16, 1993 (docket No. 545). For the reasons set forth below, the motion is hereby **GRANTED.**

Rule 42(a) of the Federal Rules of Civil Procedure provides a trial court with broad discretion to order actions consolidated where they involve a common question of law or fact. Although these two cases are very different, involving distinct questions of law and several different parties, most of the difficult issues presented by both cases have been resolved. All that remains is to determine the amount of the Dopp's recovery in the Main Case and the extent of Pritzker's right to extinguish portions of that recovery through the Litigated Credits Case. These tasks are completed in this Opinion & Order.

---

3. The concept of business ethics is embedded in our Judeo–Christian philosophy. It has been the subject of laws and of literature. Rómulo Gallegos in his renowned novel, "Doña Bárbara," symbolizes it through the erection of fences in the Venezuelan prairie ("llanos venezolanos") to guide men's conduct. Business ethics have also been included in the curriculum of our institutions of higher learning. Rev. William J. Byron, S.J., former president of the Catholic University of America, teaches a course at Georgetown University on the topic.

4. For additional background regarding the liability-related issues in the Main Case, see Dopp v. HTP Corp., 947 F.2d 506 (1st Cir.1991), and Dopp v. HTP Corp., 755 F.Supp. 491 (D.Puerto Rico 1991).

5. The verdict, as recorded in the Court's Judgment dated March 29, 1993, was as follows: (i) full damages—$17 million; (ii) damages accessory to annulment—$0; and (iii) damages accessory to resolution—$19,621,000 for resolution in natura; $210,071,000 for resolution in kind.

The two cases are intimately related. The Court finds that the interests of judicial economy weigh in favor of consolidation.

### III. Pritzker's Motion for Relief From Judgment Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (Docket No. 537)

Pritzker seeks relief from the Judgment entered in the Main Case on March 29, 1993 (docket No. 514), on two grounds: first, that a mistake was made in the jury's verdict regarding the monetary equivalent of resolution which has the effect of providing a double recovery to Dopp; and second, that the Judgment as a whole cannot be deemed "final" because of issues which remain open in both the Main Case and the Litigated Credits Case. The motion is hereby **GRANTED** in part.

The first error alleged by Pritzker is rendered moot by the Court's holding, *see infra* at Part VI, that the plaintiff is not entitled to resolution as a matter of law. As to the second error alleged, the defendant is correct that for many reasons the Judgment entered by the Court on March 29 is a partial judgment which does not conclude the proceedings in this case. The Court therefore **GRANTS** the defendant's request for relief to clarify that the Judgment entered was not, and was never intended to be, final.

### IV. Pritzker's Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial (Docket No. 538)

In this motion, Pritzker offers no fewer than 14 errors which he believes were made during the second trial in the Main Case. Several of these alleged errors overlap, however, so that in truth he advances only seven grounds for a JNOV or New Trial. Moreover, four of these seven grounds relate to issues arising from the jury's verdict on resolution and are rendered moot by the Court's determination, *see infra* at Part VI, that the plaintiff is not entitled to resolution as a matter of law.[6] The Court therefore addresses only the remaining three grounds.

### A. Plaintiff introduced evidence of deceit and duress and other evidence which inflamed the jury so that it rendered a punitive award (No. 1), and refused to award the defendant necessary expenses to which he was legally entitled (No. 4).

During the trial, the Court, determined not to allow the parties to reargue their positions regarding the defendant's liability, restricted argumentation and evidence regarding the issue of deceit or duress. The parties could not be allowed to divert the jury's attention from the task of rendering a verdict on damages by introducing unnecessary evidence regarding the defendant's liability-related conduct. Nonetheless, the damages in this case necessarily arose from the defendant's liability-related conduct. The two issues are inextricable. It would have been impossible to ask the jury to return a verdict on damages without some understanding of the conduct which lead to the defendant's liability.

To provide the jury with the necessary context, the Court included in its opening instructions a summary of the liability-related facts established during the first trial. During the presentation of evidence, the Court allowed the parties the opportunity to address the jury regarding these undisputed liability-related facts. Any comments by the plaintiff or his attorney regarding deceit or duress, provided they were not otherwise argumentative or prejudicial, fell within the parameters established by the Court. Where comments by the plaintiff or his attorney went beyond mere deceit or duress, they

---

**6.** These four grounds are:
1. The jury's award of fruits was contrary to the law of Puerto Rico and the evidence presented at trial (Nos. 5–8).
2. The jury's verdict regarding the monetary equivalent of restitution is contrary to the weight of the evidence (No. 9).
3. The jury's verdict regarding the value of Dopp's contract to purchase DBHC was contrary to the weight of the evidence (No. 11) and resulted from a failure to give requested instructions (No. 12).
4. Evidence of the current net value of DBHC was irrelevant to Dopp's damages (No. 13) and the jury's verdict as to the present net value of DBHC was unsupported by the evidence (No. 14).

were allowed because of comments or tactics on the part of the defendant which opened the door for a response. In particular, the testimony of the plaintiff regarding his dealings with Mr. Héctor González was allowed because the defendant introduced testimony from Mr. González which endeavored to establish the plaintiff's alleged inability to close on his contract to purchase the Dorado Beach Hotel Corporation ("DBHC") absent the assistance of Mr. Pritzker. The defendant offered this testimony to suggest to the jury that the plaintiff was entitled to no damages because he would have gained nothing—would have, in fact, lost $2 million—without Mr. Pritzker's participation in the deal. The testimony tended to reopen the issue of the defendant's liability. It also insinuated that the value of Dopp's contract to purchase DBHC at the time the Oral Contract was entered into—a critical issue forming the basis of the measure of full damages—was zero. The plaintiff was compelled to rebut this testimony with other evidence showing Pritzker's view of the value of Dopp's contract and the Court was required to give the plaintiff wide latitude. Evidence regarding attempts by the defendant to procure the contract and the willingness of the defendant to jeopardize gambling contracts in New Jersey and Nevada to obtain the contract was therefore relevant and not unduly prejudicial. Defendant's motion is therefore **DENIED** as to this issue.[7]

**B. The jury's verdict of full damages in the amount of $17 million was not supported by any evidence (No. 2) or, alternatively, was against the overwhelming weight of evidence (No. 3).**

Under the full damages theory, Dopp is entitled to the difference between the value of what he was promised under the Oral Contract and the value of what he actually received under the Stock Subscription Agreement. In other words, he is entitled to the difference between the value of his 12 shares of HTP Corporation, which were unencumbered under the terms of the Oral Contract, and the value of the 12 encumbered shares he received under the terms of the Stock Subscription Agreement. The jury, being so instructed, returned a verdict under the full damages theory in the amount of $17 million. Pritzker attacks this verdict as unsupported by the evidence.

The well-established standard in the First Circuit for granting a motion for judgment *non obstentio verdicto* (JNOV), which is now known as a judgment as a matter of law, is "very rigorous." *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 128 (1st Cir.1989). Such a motion may only be granted "when the evidence, and the inferences to be drawn therefrom, viewed in the light most favorable to the nonmovant ... could lead reasonable persons to but one conclusion." *Dopico–Fernández v. Grand Union Supermarket*, 841 F.2d 11, 12 (1st Cir.), *cert. denied,* 488 U.S. 864, 109 S.Ct. 164, 102 L.Ed.2d 135 (1988). In effect, to grant a motion for judgment as a matter of law, the Court must find that the jury, upon hearing all the evidence properly admitted, acted unreasonably. Such a conclusion can only be reached under circumstances in which it is clearly dictated. A trial court must always be mindful that "[n]either [its] disagreement with the jury's verdict nor the fact that [it] would have found otherwise in a bench trial, is a sufficient basis to displace a jury's verdict." *Davet v. Maccarone*, 973 F.2d 22, 29 (1st Cir.1992).

Pritzker has, in essence, two objections to the jury's verdict on full damages. First, he argues that the jury improperly accepted Dopp's proposition that the value of his minority interest in HTP may be equated, in direct proportion to the number of minority

---

**7.** The defendant also objects that counsel for the plaintiff suggested to the jury that they should enter a punitive award by stating in his closing argument that Dopp is entitled to recover large sums as fruits because "[t]hat's a penalty imposed by the law." The Court rejects this contention for several reasons. First, the statement was made not in the context of the plaintiff's entitlement to fruits but in the context of the defendant's entitlement to reimbursement for necessary expenses. Second, the defendant did not object to the comment at the time and therefore waived any objection. Third, a statement that a certain aspect of the law reflects a penalty does not form the basis of a claim for punitive damages. Fourth, in its context, and with the instructions given by the Court, the jury could not have felt they were to enter a punitive award.

shares, to an equal percentage of the value of HTP's assets net of their costs. This objection is easily rejected. In essence, Pritzker complains that the jury improperly assessed credibility and rejected the theories advanced by his experts. He seeks to have the Court declare that a reasonable jury could not have accepted the theory advanced by Dopp's experts.

Respected experts could disagree on the proper way to appraise the value shares of stock in a closely held corporation. The task involves a multitude of considerations regarding, among other factors, the purposes of the appraisal, the applicable standard of value, the reliance on projected or historical data, the value of a minority versus a controlling interest, the marketability of a minority interest, the techniques for forecasting and discounting future returns, the ability of a minority interest holder to adequately gather relevant data, and the assembling of a list of comparative transactions. *See generally* Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (Dow Jones–Irwin 2d ed. 1989). Experts could disagree on each of these issues, as well as many others. In this case, the experts did in fact disagree. Under such circumstances, the responsibility for determining which position is more credible or appropriately applied falls to the jury. The defendant's attempt to have the Court displace the credibility assessment made by the jury is at the core of matters not reviewable on a motion for judgment as a matter of law.[8]

Second, Pritzker argues that the jury inappropriately determined full damages based on a calculus presented by Dopp's counsel in his closing argument which was allegedly infected by improper computations. This argument must also be rejected, for several reasons. First, it is not at all clear that the jury accepted the calculus presented by Dopp's counsel. As a general matter, in a case which lasted several weeks and which involved the presentation of exceedingly complicated factual and expert evidence, it is difficult, if not impossible, to gauge in any meaningful way the thought processes of the jury. Moreover, as a practical matter, the fact that the jury awarded Dopp almost $1 million less than he asked for indicates that they did not accept the calculus he presented.

More importantly, however, regardless of the steps which led the jury to its verdict on full damages, the verdict itself is reasonable based on the evidence. Pritzker argues that the jury's verdict must be invalid because "the *most* that Dopp's full damages could ever have been is measured by 12% of the net value of HTP on December 3, 1984." This is not so. In calculating the loss suffered by Dopp as a result of the inclusion of the buyout option in the Stock Subscription Agreement, the jury need not have limited its consideration to the actual value of Dopp's unencumbered shares in HTP as of the date of the breach of the Oral Contract. The jury was required to determine Dopp's *loss* as of the date of the breach; however, at that moment Dopp's loss included the likelihood that he would be deprived of any participation in the future profits generated by the properties. The jury could have taken into account that a corporation which owns world-class resort properties could potentially generate considerable future profits—profits which would be denied to Dopp if his shares were bought out by Pritzker. Without the buyout option in the Stock Subscription Agreement, Dopp controlled 12 unencumbered shares in HTP. Like any investment, Dopp's 12 shares had the potential to make money or to lose money. And they had this potential *ad infinitum*—that is, Dopp would continue to benefit, or to lose, as a result of his shares in HTP until he chose to withdraw from the investment or a situation otherwise dictated his withdrawal.

The jury's task in determining the amount of money which Dopp would have otherwise enjoyed as a return on his investment was not an easy one. The Court finds, however, that it was not unreasonable for the jury to

---

8. There can be no doubt that the evidence presented in this case was complicated. The jury's task in rendering a verdict entailed a series of computations involving millions of dollars. However, of the nine jurors empaneled, four had received degrees in accounting or business administration. The jury was therefore highly qualified to render a verdict in this case. Its expertise is reflected in the fact that the verdict which it rendered was reasonable.

conclude that the evidence supported a verdict of $17 million. The jury had at its disposal ample evidence regarding the profits to be generated from the hotels, from the real property, and from the management of the hotels to support its verdict.

### C. Dopp failed to demonstrate that he could have exercised his option to purchase DBHC (No. 10).

This issue goes directly to the issue of defendant's liability and was established conclusively by the verdict rendered in the first trial. The plaintiff was not required, nor even allowed, to address this issue in this trial.

### V. Dopp's Motion to Alter or Amend the Judgment as to the Full Damages Remedy (Docket No. 540)

In this motion, Dopp advances a theory he presented to the Court during the trial—that the measure of full damages should reflect the monetary equivalent of resolution. Among other things, the theory is predicated on the notion that Dopp is entitled to resolution, which he is not. *See infra* at Part VI. The motion is therefore **DENIED**.

### VI. Plaintiff's Motion Electing Resolution as his Remedy (Docket No. 552); Brief in Support of Plaintiff's Election of Resolution as His Remedy (Docket No. 560); Memorandum of Defendant Jay Pritzker with Respect to Issues Relating to Resolution of the Oral Contract (Docket No. 559)

Pursuant to the circuit court remand, the plaintiff was required, after the jury rendered its damage verdicts under the theories of full damages, damages accessory to annulment, and damages accessory to resolution, to make an election among these remedies. The plaintiff elected resolution. Since the issue of the plaintiff legal entitlement to resolution has remained open, the Court accepted from the parties memoranda of law discussing the issue.

The plaintiff's memoranda nonetheless begins with the insupportable proposition that "the Court of Appeals for the First Circuit has already determined that Pritzker breach-

ed a reciprocal obligation ... [so that] Dopp is entitled to demand resolution, together with the accessory damages assessed by the jury." The Court simply points out that the circuit court opinion clearly states:

> Depending on the proof, the plaintiff *may or may not,* as an alternative to annulment, satisfy the district court that he is entitled to an order for resolution of the Oral Contract. *We, of course, intimate no view as to that question.*

*Dopp. v. HTP,* 947 F.2d at 520 (emphasis added). The plaintiff's suggestion that circuit court *has* intimated a view on this question—has, in fact, ruled in the plaintiff's favor—is flatly incorrect.

### A. Resolution Generally

The law of resolution under the Puerto Rico Civil Code has been described in opinions issued in this case by both this Court, *see Dopp v. HTP,* 755 F.Supp. at 497–98, and by the First Circuit, *see Dopp v. HTP,* 947 F.2d at 510–11. Nevertheless, because this is a crucial issue facing the Court, a brief review of its contours is in order.

■ Article 1243 of the Civil Code establishes the right to rescind any contract "specially determined by law." 31 L.P.R.A. § 3492(5). Article 1077 provides:

> The right to rescind the obligations is considered as implied in mutual ones, in case of one of the obligated persons does not comply with what is incumbent upon him.
>
> The person prejudiced may choose between exacting the fulfillment of the obligation or its recision, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfillment, should the latter appear impossible.
>
> The court shall order the rescission demanded, unless there are sufficient causes authorizing it to fix a period.
>
> This is understood without prejudice to the rights of third acquirers....

31 L.P.R.A. § 3052. The effect of a resultory action is that the parties are obliged to return "the things which were the objects of

the contract, with their fruits and the price with interest." 31 L.P.R.A. § 3514. Not every breach of a contractual obligation gives rise to a resultory action under article 1077. *See Del Toro v. Blasini,* 96 P.R.R. 662, 669 (1968); *Vélez v. Ríos,* 76 P.R.R. 806, 811–12 (1954); *Ponce v. Vidal,* 65 P.R.R. 346, 351 (1945). For such an action to exist "the nonfulfilled obligation must be of a reciprocal character." *Vidal,* 65 P.R.R. at 351. The Supreme Court of Puerto Rico has stated that reciprocity inheres when "there are obligations and correlative obligations [that are] so interdependent between themselves that one is the consequence of the other, and the performance of said obligation by a contracting party constitutes the motive of the contract for the other party and vice versa." *Id.* As this Court has previously explained:

> The Civil Code provides no definition of reciprocal obligation giving rise to a resolutory action, although the commentators and the courts have discussed the concept extensively. Vélez Torres has stated that when both of the contracting parties remain obligated by means of the origin of the legal relationship between them, it is said that there are reciprocal relations ("relaciones recíprocas") because the obligation of one is derived from the obligation of the other; in order to be considered a motive for resolution, the unfulfillment must be related to a principal, reciprocal obligation. IV J. Vélez Torres, *Curso de Derecho Civil,* 47, 52 (1981) (paraphrasing ours). Velázquez has noted that sinalagmatic (bilateral) contracts are those that create reciprocal obligations, and in such contracts, the reciprocal obligations of the parties are served mutually as consideration or the motive or reason for entering into the contract, and if one of the parties does not perform its obligation, the other party is not compelled to perform its (reciprocal) obligation. G. Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño* §§ 21, 23 (1964). *See also* II A. Blanco, *Curso de Obligaciones y Contratos* 332 (1980) (resolution is the consequence of the nonfulfillment of one of the contracting parties' reciprocal obligations).

In addition, the Supreme Court of Puerto Rico has stated that in bilateral contracts, there are "obligations and correlative obligations" which are "so inter-dependent" that one is a consequence of the other; the performance of the obligation by a contracting party constitutes the motive of the contract for the other party, and vice versa. *Vidal,* 65 P.R.R. at 351. *See also Del Toro v. Blasini,* 96 P.R.R. 662, 669 (1968) (if one of the promises constituting the mutual consideration is not executed, the correlative obligation ceases to have consideration). Likewise, the Supreme Court of Spain, in discussing reciprocal obligations and Article 1.124 of the Spanish Code (the equivalent of Article 1077), has said that before it can be stated that reciprocal or bilateral obligations are involved, it is necessary not only that obligations or consideration ("prestaciones") from both parties exist in the same contract, but also that the obligation of one party should be correlative to the obligation of the other, and consequently, there should exist between the two parties a mutual undertaking. This "undertaking" produces a twofold result: first, in order for Article 1.124 of the Civil Code to apply, the condition of reciprocity must be so well established that one obligation cannot be conceived without the other. Second, Article 1.124 may not be applied to obligations which, even though incorporated as part of a unilateral or bilateral contract, have an accessory or complementary character in relation to those promises and correlative promises which constitute the main object of the contract. Decision of January 5, 1935, Supreme Court of Spain, 217 *Jurisprudencia Civil* 46 (citations omitted) (paraphrase of Supreme Court translation in *Vidal,* 65 P.R.R. at 355).

*Dopp v. HTP Corp.,* 755 F.Supp. at 497–98 (footnotes omitted). Where the unfulfilled obligation lacks this interactive quality, the aggrieved party is entitled to recover full damages, but is not entitled to resolution. *See Del Toro,* 96 P.R.R. at 669. Where the contractual obligations are mutual and reciprocal, however, article 1077 attaches.

## B. Resolution *in Natura*

Where mutual obligations have been breached and the return of the properties

exchanged under the contract to be resolved is feasible, the plaintiff is entitled to the entry of an order of resolution *in natura*. The plaintiff has requested such an order. The Court finds, however, that special problems prevent an order directing that Dorado Beach and Cerromar hotels be transferred to Dopp.

■ Article 1077 of the Civil Code directs, in part, that upon resolution of a contract the parties be returned the things which were the objects of the contract. Dopp seeks to invoke Article 1077 to have the Dorado and Cerromar properties "returned" to him. The properties cannot be returned to him, however, because he did not transfer them to Pritzker under the terms of their agreement. He could not have done so because *he never owned the properties.* He owned only a contract to purchase the properties for $40.5 million. This is what he transferred to Pritzker. The closest Dopp ever came to owning the hotels was his 12 percent interest in HTP Corporation *after* the Oral Contract was made. If Dopp had owned the hotels and sold them to Pritzker for $40.5 million plus a 20 percent participation interest in their future ownership, then a straightforward application of Article 1077 would result in the return of the properties to Dopp if the contract transferring their ownership was resolved. However, Dopp's reciprocal obligation (*see infra* at 950) was to assign to Pritzker his contract to purchase DBHC, not to sell the properties. Dopp cannot claim the property as the item given by him in discharge of his reciprocal obligations. He is not, under the terms of the Civil Code, entitled to have the properties returned to him.

An argument could be made that Pritzker's opportunity to purchase the hotels was a "fruit" derived from his unlawful control of Dopp's contract to purchase which he must return to Dopp. This theory stretches the operation of Article 1077 beyond any reasonable point, however. It would allow the "fruits" portion of the statute to overwhelm the rest. It would require the Court to enter into an imaginary world in which Dopp's right to purchase the hotels, which has not existed for eight years, is somehow revived. It would also allow Dopp to get *more* than he

had prior to entering into the Oral Contract, and such unjust enrichment must be avoided. For these reasons, the Court FINDS that an order of resolution *in natura* would be impracticable and contrary to the terms of the Civil Code in this case.

## C. Resolution in Kind

■ When resolution *in natura* is not feasible, Article 1247 of the Civil Code directs the entry of an order of resolution in kind. Article 1247 provides:

Rescission obliges the return of the things which were the objects of the contract, with their fruits and the price with interest; therefore it can only be carried into effect when the person who may have claimed it can return that which, on his part, he is bound to do.

Neither shall rescission take place when the things which are the object of the contract are legally in the possession of third persons who have not acted in bad faith.

In such case the indemnity for damages may be claimed from the person who caused the lesion.

31 L.P.R.A. § 3496. The Court must therefore, given its finding that resolution *in natura* is not feasible, consider whether Pritzker must indemnify Dopp for the monetary equivalent of resolution *in natura.* The Court **FINDS** that the plaintiff is not entitled to resolution in kind because he has not shown that he is legally entitled to resolution in any form.

In its Opinion & Order entered after the first trial in this case the Court held:

After careful consideration of plaintiff's argument, we conclude that *the inclusion of the option clause in the written contract does not constitute the unfulfillment of a reciprocal obligation of the oral agreement as contemplated by Article 1077 of the Civil Code.* In this case, the oral agreement between plaintiff and Pritzker provided that the Pritzker interests would furnish all the money for the deal and Mr. Dopp would be reimbursed for all the costs he had incurred, the Pritzker interests would receive an 80 percent interest in the

stock of the corporation which would acquire the Dorado Beach Hotel Corporation stock and a long-term contract for managing the hotel. Dopp would receive a 20 percent interest in the stock of the corporation which would acquire the Dorado Beach Hotel Corporation stock. (Tr. 1354.) Thus, the reciprocal obligations or the consideration or motive for each of the parties to enter into the contract would be, for the plaintiff, the Pritzker interests furnishing the money for the deal and reimbursing plaintiff for the costs he had incurred, as plaintiff's receiving a 20 percent interest in the corporation acquiring Dorado Beach Hotel Corporation, and for the Pritzker interests, receiving a majority (80 percent) interest in the corporation acquiring Dorado Beach Hotel Corporation and the long-term contract for managing the hotel properties.

The plaintiff claims that one of his reasons or motives for entering into the oral contract, one of the "conditions of reciprocity" which could not be conceived without defendant Pritzker's obligations, was an undiluted 20% equity participation in the corporation which would own the Dorado and Cerromar hotels. He makes this assertion even though he "fully expected that there would be some reasonable option." (Tr. 116.) According to the plaintiff, the imposition of the option clause, which was expected by plaintiff, diluted the value of his participation and therefore gave rise to the unfulfillment of defendant's "reciprocal obligation" to give the plaintiff 20% participation.

We do not agree. As stated above, because the jury found that the Stock Subscription Agreement was entered into due to deceit or duress, it has been declared null as to plaintiff's interest. Plaintiff is essentially arguing that the valid November 30, 1984 agreement, which contains the 20% undiluted participation, should be resolved on the basis of a subsequent written contract which has been declared null. A subsequent written agreement which has been declared null cannot constitute the basis of an unfulfilled reciprocal obligation giving rise to the resolution of a valid, enforceable contract.

755 F.Supp. at 499 (footnote omitted) (emphasis added).

In his brief in support of his election of resolution as his remedy, the plaintiff makes little effort to present facts, law or argumentation on which the Court might reverse its prior finding that the inclusion of the buyout provision in the Stock Subscription Agreement did not constitute a breach of a reciprocal obligation of the Oral Contract. The plaintiff goes no further than reiterating his assertion that his control of an undiluted 20 percent equity share in HTP was a reciprocal obligation of the Oral Contract. He states:

> Dopp agreed to provide the contract to purchase the hotel complex and has as his consideration the promise offered in exchange by Pritzker. This was the 20% equity participation in the hotel complex and the reimbursement of the upfront money. As can readily be seen from the transcript, the structure and intent of the Oral Contract was for Dopp to have that interest in the acquiring entity. Such interest was clearly a principal reciprocal obligation.

Plaintiff's Memorandum at 14. The balance of the plaintiff's memorandum concerns the secondary issues of whether the allegedly reciprocal obligation was breached and whether he fulfilled his obligations under the Oral Contract.

Under the doctrine of "the law of the case," the Court's prior finding controls the issues of the plaintiff's entitlement to resolution absent extraordinary circumstances not present here. *Accord Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1982), *reh'g denied,* 462 U.S. 1146, 103 S.Ct. 3131, 77 L.Ed.2d 1381 (1983) (citation omitted) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") The Court may, in its discretion, reopen a point of law already decided; however, this "is a power which will necessarily be exercised sparingly, and only in a clear instance of previous error, to prevent manifest injustice." *White v. Higgins,* 116 F.2d 312, 317 (1st Cir.1940); *see also Piazza v. Aponte Roque,* 909 F.2d 35, 38

(1st Cir.1990). In this case, the plaintiff has failed to articulate even the smallest reason to reverse *any* aspects of the Court's prior ruling.

Although the Court is inclined merely to incorporate the findings of fact and conclusions of law contained in its prior Opinion & Order, in an effort to comply strictly with the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court sets forth the following essential findings of fact and conclusions of law:

1. The Oral Agreement entered into between plaintiff Paul S. Dopp and defendant Jay Pritzker on November 30, 1984, provided that *Pritzker* would furnish all the money needed to exercise the right held by Dopp—through Code Hospitality—to acquire under a purchase agreement the stock or assets of the Dorado Beach Hotel Corporation (hereinafter "DBHC") in return for an 80 percent interest in a corporation ("HTP") that would be formed to acquire DBHC's stock as well as the awarding to a Hyatt affiliate of a long-term contract to manage the hotels.

2. The Oral Agreement entered into between plaintiff Paul S. Dopp and defendant Jay Pritzker on November 30, 1984, provided that *Dopp*—through Code Hospitality—would assign all his rights under the purchase agreement in return for a 20 percent interest in HTP and the repayment of all money expended by Dopp in anticipation of the closing.

3. The *reciprocal obligations* of the Oral Agreement assumed by *Pritzker* were the furnishing of the money needed to acquire the stock of DBHC, the reimbursing to Dopp of all the money he expended in anticipation of the closing, and the execution of an agreement giving Dopp a 20 percent interest in HTP.

4. The *reciprocal obligations* of the Oral Agreement assumed by *Dopp* were the assignment of his rights under the purchase agreement and the execution of an agreement giving Pritzker an 80 percent interest in HTP and giving to a Hyatt affiliate a long-term contract to manage the hotels.

5. Dopp and Pritzker did not agree, as a reciprocal obligation for Dopp, to sell and transfer to Pritzker the hotel's property in return for the obligations assigned by Pritzker hereinbefore stated.

6. Providing Dopp with an *unencumbered* 20 percent equity interest in HTP is *not* a reciprocal obligation of the Oral Agreement assumed by the defendant. Indeed, the plaintiff "fully expected that there would be some reasonable option" and therefore did not rely on the absence of an option clause to enter into the Oral Agreement.

7. The inclusion of the buyout provision in the Stock Subscription Agreement, although a breach of the Oral Agreement, did not constitute a breach of a reciprocal obligation of the Oral Agreement.

8. The plaintiff is not legally entitled to the resolution of the Oral Agreement, which remains in full force and effect.

Since the plaintiff is not legally entitled to resolution, his motion electing resolution as his remedy must be **DENIED.** The plaintiff must now make an election between the remedies of full damages, as set forth in this Opinion & Order, or annulment.

## VII. Interest and Attorneys' Fees

Under the circumstances present in this case, the Court finds that legal interest and attorneys fees must be added to any monetary award enjoyed by Dopp. As to legal interest, Rule 44.3(b) of the Puerto Rico Rules of Civil Procedure provides, in pertinent part:

Except [under circumstances not present here] ... the court will ... impose on the party that has acted rashly the payment of interest at the rate fixed by the [Finance] Board [of the Office of the Commissioner of Financial Institutions] by virtue of the previous subsection which is in effect at the moment the judgment is pronounced ... from the time the claim is filed in actions for damages until the date the judgment is pronounced, to be computed on the amount of the judgment.

32 L.P.R.A.App. III R. 44.3(b). The rate fixed for the period from July 1, 1993 to December 31, 1993 is seven percent.

Pritzker has acted with temerity throughout these proceedings.[9] His conduct which gave rise to this action was found by the first jury to constitute *dolo,* which can be translated as deceit or duress and incorporates notions of willfulness and insidious machinations ("maquinaciones insidiosas"). *Accord* 31 L.P.R.A. § 3408. After the first trial in this case the Court determined that Pritzker's conduct had been obstinate. *Accord Dopp v. HTP Corp.,* 755 F.Supp. at 503. He then appealed the first jury verdict, thereby causing significant additional expenditures by the plaintiff, only to have the amount of the verdict against him increased by the second verdict. Finally, the posture assumed by Pritzker since the entry of the second verdict, which boils down to an assertion that the plaintiff is entitled to a recovery of not more than $35,000, is intolerable. By assuming such an extreme position, which is an affront to the Court, Pritzker has complicated the Court's task in determining the validity of the jury's verdict. In short, throughout this litigation, the defendant has assumed an unyielding and unrealistic view which is the quintessence of temerity.[10] The Court therefore **FINDS** that pursuant to Rule 44.3(b) of the Puerto Rico Rules of Civil Procedure the plaintiff's recovery must be augmented at a rate of seven percent, compounded annually, for the period from which the complaint was filed—August 16, 1988—until the date of this Judgment, yielding pre-judgment interest in the amount of *$6,843,379.42* under the full damages theory.[11]

In addition, Rule 44.4(d) of the Puerto Rico Rules of Civil Procedure provides that "[w]here a party has been obstinate, the court shall in its judgment impose on such person the payment of a sum for attorney's fees." 32 L.P.R.A.App. III R. 44.4(d); *see also Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (the federal courts have recognized the Puerto Rican rule as a matter of substantive right). Rule 44.4(d) is not intended to provide court costs to a prevailing party. Rather, it is a special award imposed where a party has, in regard to an entire case or a specific issue, unreasonably held to a position regarding an issue of fact or law. *Accord Sánchez v. Cooperativa Azucarera,* 66 D.P.R. 346 (1946); *Prado v. Quiñones,* 78 P.R.R. 309 (1955). Such fees are awarded where a party has been "stubbornly litigious" so as to cause "unnecessary inconveniences and expenses." *Reyes v. Banco Santander de Puerto Rico,* 583 F.Supp. 1444, 1445 (D.Puerto Rico 1984); *see also Pereira v. I.B.E.C.,* 95 P.R.R. 28, 66 (1967). To be awarded fees under Rule 44, a party is not required to establish the fees expended under the terms otherwise required in the First Circuit. It is customary for the local courts to award fees under Rule 44 without taking evidence of attorney services. *Accord Pan American World Airways, Inc. v. Ramos,* 357 F.2d 341, 342 (1st Cir.1966).[12]

The Court concludes that Pritzker has acted obstinately throughout this litigation and awards attorneys fees to Dopp, with due regard to the degree of the defendant's conduct and the work necessarily done by counsel for Dopp, in the amount of *$1.5 million.*

---

9. Although the official translation of Rule 44.3 speaks of a party who acts "rashly," the term used in the official Spanish version of the rule is "temeridad," which is more appropriately translated as "temerity."

10. Furthermore, the Court instructed the jury to reach a verdict under the full damages theory measuring the plaintiff's damages as of the moment the Oral Contract was breached. As a result the jury's verdict under the full damages theory measured the injuries suffered by the plaintiff as of 1984. A judgment under the full damages theory that did not make some adjustment for pre-judgment interest would therefore not adequately compensate the plaintiff for the harm he suffered.

11. The interest on $17 million dollars compounded annually is $1,190,000 in Year One (1988–89); $1,273,300 in Year Two (1989–90); $1,364,310 in Year Three (1990–91); $1,457,801.17 in Year Four (1991–92); and $1,559,847.25 in Year Five (1992–93).

12. The Court notes for the record, however, that in a similar case, *Lipsett v. University of Puerto Rico,* Civil No. 83–1516 (JP), which also was remanded from the circuit court, the Court, based on First Circuit procedure, entered an order of attorneys fees in the amount of $678,000. Given that this case involved approximately three times more work on the part of the attorneys, the Court feels that the fees it is awarding is more than reasonable.

Dopp's total recovery if he elects full damages as his recovery is therefore *$25,343,-379.42.*

## VIII. Litigated Credits

### A. Background

During the period between the remand of the Main Case and its second trial, Dopp entered into a series of agreements with Bob Yari, Lincoln Realty, and Baird, Patrick & Co. (hereinafter "BPC") through which he received money in exchange for percentage shares in his recovery in the Main Case. By an Opinion & Order dated March 5, 1993, the Court held that each of these agreements affected invalid transfers of "litigious credits" as defined in Article 1425 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3950, and that Pritzker is entitled, pursuant to Article 1425, to "extinguish [each credit] by reimbursing the assignee for the price the later paid for it, the judicial costs incurred by him, and the interest on the price from the day on which the same was paid." *Id.* The Court left for another day the task of determining the amounts which Pritzker would be required to pay to each of the assignees and the percentage of Dopp's recovery in the Main Case which he would, in turn, be entitled to extinguish.[13] On June 9, 1993, the Court accepted evidence and argumentation regarding the issues which had been left undecided.[14] The Court now enters findings of fact and conclusions of law on these remaining issues.

### B. Redemption of Litigated Credits under Puerto Rico Law

Upon making a showing under Article 1425 that the credit to be extinguished is "liti-gious" and that he exercised his right within the time provided for in the statute, a debtor "shall have the right to extinguish the [credit]." 31 L.P.R.A. § 3950 (emphasis added); *see also Matheu v. Colón,* 49 P.R.R. 365, 374 (1936) ("debtor shall be entitled to extinguish credits sold"). To do so, the debtor must pay the assignee of the credit "the price the later paid for it, the judicial costs incurred by him, and the interest on the price from the day on which the same was paid." 31 L.P.R.A. § 3950. The judicial costs which must be reimbursed include those necessary to make whole the assignee for costs incurred prosecuting the underlying action.[15] The interest which must be paid is calculated at a rate of six percent pursuant to 31 L.P.R.A. § 4591.

### C. Findings of Fact

After receiving all relevant evidence during the proceeding held on June 9, 1993, as well as additional relevant evidence submitted thereafter, the Court enters the following Findings of Fact:

*Lincoln Realty*

1. By a Judgment or Settlement Purchase Agreement dated June 26, 1990, Dopp sold to Lincoln Realty for the sum of $50,000.00 an eight percent interest in any judgment or settlement in favor of Dopp in the Main Case to the extent such judgment or settlement would exceed $2 million, as well as an eight percent interest in any residual shares of HTP Corporation held by Dopp.[16]

---

13. On April 29, 1993, the Court entered Partial Judgment on the issues resolved in its Opinion & Order. Unfortunately, the Partial Judgment suffered from a clerical error. It stated that the Opinion & Order of the Court was dated *April 19, 1993,* while it was actually dated *March 5, 1993.* The Court ORDERS the Clerk of the Court to issue an amended Partial Judgment *nunc pro tunc* correcting this error.

14. The Court originally referred to the June 9 proceeding as a hearing; however, it was a Non-Jury Trial. At the outset of the proceedings the defendants objected to having the case proceed without a jury, but this objection was rejected based on the fact that the defendants did not request a jury trial in a timely manner.

15. Defendant Baird, Patrick & Co. has argued that it is entitled to be reimbursed for expenses incurred in the Litigated Credits Case. Such a suggestion is flatly inconsistent with the language and purpose of Article 1425, which does not contemplate lengthy and costly resistance by an assignee to the debtor's right of redemption. The debtor's right is automatic and he is not required to subsidize an assignee's legal efforts to resist redemption.

16. Assertions by Lincoln Realty regarding the timeliness of Pritzker's tender are rejected as unpersuasive and tardy.

2. Any other monies advanced by Lincoln Realty to Dopp were in the form of a loan and not in exchange for any interest in the Main Case.

3. Lincoln Realty makes no claim regarding court costs and expenses incurred in relation to the Main Case.

4. Pritzker seeks to extinguish Lincoln Realty's eight percent interest in any judgment in this case and makes no claim on its eight percent residual interest in Dopp's shares of HTP.

5. At a rate of six percent, the amount of interest due on $50,000 from June 26, 1990, the date on which the amount was transferred to Dopp, until January 15, 1993, the date on which Pritzker deposited the funds with the Court, is $1,650.

6. By a Second Motion for Consignment of Funds dated January 15, 1993 (docket No. 8), which was accepted by the Court by an Order dated February 22, 1993 (docket No. 27), Pritzker consigned with the Court an interest-bearing certificate of deposit issued by The Chase Manhattan Bank, N.A. in the face amount of $58,200 to be paid to Lincoln Realty in the event that the Court order Lincoln Realty's interest in the Main Case extinguished.

### Baird, Patrick & Co.[17]

7. By a letter agreement dated October 16, 1991, Dopp sold to Baird, Patrick & Co. a five percent interest in his total recovery in the Main Case in return for a payment amounting to $100,000.00. The payment was made by BPC through a series of checks and wire transfers over the period from August 21, 1991 to December 18, 1991.

8. BPC has incurred no judicial costs which it can recover under Article 1425. Any costs which it has incurred have been in connection with the Litigated Credits case and are not recoverable.

9. At a rate of six percent, the amount of interest due to BPC is: (i) $1,680 for the payment of $20,000 made on August 21, 1991; (ii) $3,000 for the payment of $40,000 made on October 16, 1991; (iii) $1,400 for the payment of $20,000 on November 15, 1991; and (iv) $1,296 for the payment of $20,000 on December 18, 1991—for a total of $7,376 in interest due.

10. By a Second Motion for Consignment of Funds dated January 15, 1993 (docket No. 8), which was accepted by the Court by an Order dated February 22, 1993 (docket No. 27), Pritzker consigned with the Court an interest-bearing certificate of deposit issued by The Chase Manhattan Bank, N.A. in the face amount of $97,300 to be paid to BPC in the event that the Court order BPC's interest in the Main Case extinguished. By a Motion for Additional Consignment of Funds dated May 27, 1993 (docket No. 71), Pritzker consigned with the Court an additional $10,000 to be paid to BPC.

### Bob Yari

11. By an Agreement dated July 23, 1992, Bob Yari undertook to (i) advance an initial cash payment to Dopp of $250,000 to be used at Dopp's discretion and to be repaid from Dopp's line of credit and (ii) to cooperate with Dopp to establish a one year line of credit in Dopp's name.

12. The July 23 Agreement was not a "personal service" contract but rather an agreement to allow Yari joint control of the litigation of the Main Case.

13. Yari never paid Dopp $3 million, nor was he ever obligated to pay Dopp $3 million. Yari performed both of his obligations under the July 23 Agreement by paying to Dopp $250,000 as an initial cash payment and by offering his personal guaranty to two banks in an effort to secure a line of credit in Dopp's name. Despite Yari's efforts, a line of credit could not be secured. The result being that Yari was

---

**17.** On June 4, 1993, BPC filed an Answer to Pritzker's Amended Complaint which also set forth a Counterclaim alleging that Pritzker's actions in seeking to extinguish BPC's interest under Article 1425 constitute tortious interference with BPC's contract with Dopp. Since the Court has held that Pritzker is legally entitled to extinguish BPC's interest pursuant to Article 1425, BPC's counterclaim cannot stand and is hereby **DISMISSED.**

not indebted to banks in the sum of $3 million as the original contract intended.

14. Paragraph five of the Agreement provides that any monetary proceeds from any final judgment of the Court in the Main Case, after the deduction of any sums due Dopp's attorneys (Ledesma, Palou & Miranda) for services rendered in the case, shall be distributed as follows: (i) first, to repayment of all indebtedness in relation to the line of credit to have been obtained in Dopp's name; (ii) second, $2,500,000 to Yari; (iii) third, $12,000,000 to Dopp; (iv) fourth, $7,000,000 to Yari; and (v) fifth, the remaining amount, if any, to be divided equally between Dopp and Yari.

15. On September 24, 1992, Dopp and Yari entered into a signed, written modification of their Agreement, which called for Yari to advance to Dopp, in an amount to be determined and to be negotiated by the parties in good faith, funds necessary to allow Dopp's prosecution of the Main Case to proceed diligently. The modification ratified that the parties "fully intend to move forward with the present [July 23] Agreement despite the fact that a line of credit may not be obtainable."

16. Yari complied with all requests for funds by Dopp. Upon execution of the modification, he advanced to Dopp a requested additional $50,000. Shortly after receiving a request for additional funds from Dopp on November 5, 1992, Yari advanced to him an additional $100,000 (in two installments, one of $80,000 and another of $20,000). In early December 1992, Yari advanced to Dopp an additional $50,000 to cover litigation expenses. In March 1993, Yari made one final advance to Dopp in the amount of $50,000, again to cover litigation expenses.[18]

17. The final advance was made by Yari after Pritzker filed the Litigated Credits Case based on Yari's conclusion that he was under a continuing obligation to advance monies to Dopp under the September 24 modification.

18. The Dopp/Yari Agreement did not create a partnership between the parties. Rather than establishing an association in which the parties were co-owners of Dopp's potential recovery in the Main Case with the intent to share the profits (see 2 Cal.Stat.Ann. § 15006; Cochran v. Board of Supervisors, 85 Cal.App.3d 75, 149 Cal. Rptr. 304 (1978)), the Agreement merely set forth the extent of the interest in the Main Case purchased by Yari individually, which was contingent on the amount of the recovery.

19. At a rate of six percent, the amount of interest due to Yari is: (i) $7,500 for the advance of $250,000 made on July 23, 1992; (ii) $1,000 for the advance of $50,000 made on September 24, 1992; (iii) $1,000 for the advance of $100,000 made on November 5, 1992; and (iv) $250 for the advance of $50,000 made in early December 1992—for a total of *$9,750* in interest due.

20. Yari has not proven any judicial costs for which he is entitled to reimbursement.[19]

21. By a Motion for Consignment of Funds dated December 18, 1992 (docket No. 4), which was accepted by the Court by an Order dated December 28, 1992 (docket No. 5), Pritzker consigned with the Court an interest-bearing certificate of deposit issued by The Chase Manhattan

---

18. On May 14, 1993, Yari filed, along with his Answer to Pritzker's Amended Complaint, a Cross–Claim against Dopp seeking declarations regarding their relationship. The Cross–Claim has not been pursued in any fashion and it has not been established whether the Court has or would entertain jurisdiction over the claim. It should be noted, however, that Findings of Fact Nos. 15 and 16 effectively dispose of Yari's Cross–Claim in his favor, at least for purposes of this action.

19. On July 16, 1993, Yari filed a Motion Submitting Legal Invoices (docket No. 101) which purportedly reflects the work performed in the prosecution of the Main Case. The submission is, however, an unedited printout which collects charges for a number of legal services, some of which are not related to the prosecution of the Main Case. Moreover, Yari has made no attempt to collate the information and propose to the Court an amount to be reimbursed. It is simply impossible for the Court to sort out Yari's request for attorneys fees, which is unfortunate because it appears that to at least some degree he is entitled to fees.

Bank, N.A. in the face amount of $464,000 to be paid to Bob Yari or the Dopp/Yari partnership in the event that the Court order its interest in the Main Case extinguished. By a Second Motion for Additional Consignment of Funds dated June 1, 1993 (docket No. 75), Pritzker consigned with the Court an additional $51,500 to be paid to Yari or the Dopp/Yari partnership.

### *Ledesma, Palou & Miranda*

22. By a Ratification and Assignment dated March 27, 1990, Dopp agreed to pay Ledesma, Palou & Miranda, for legal services rendered in Civil Case No. 88–1420, 25 percent of all amounts in excess of $666,000 recovered by judgment, settlement or otherwise in Civil Case No. 88–1420.

23. By an Amendment to the Ratification and Assignment dated February 6, 1993, Dopp agreed to pay Ledesma, Palou & Miranda, for services rendered in both Civil Case No. 88–1420 and Civil Case No. 92–2835, 25 percent of all amounts awarded by judgment, settlement or otherwise in Civil Case No. 88–1420.[20]

### D. Redemption of Credits Transferred Under Yari Agreement

At various stages of the Litigated Credits Case, the defendants have argued that Article 1425 does not apply to the various agreements. When opposing Pritzker's motion for partial summary judgment, the defendants argued that Article 1425 did not apply because (i) the agreements did not involve the sale of litigated credits because they transferred only an interest in litigation, not title over Dopp's right, and (ii) the intention of the parties in entering into the contracts was only to provide Dopp with funds to continue prosecuting his case, not to speculate in ongoing litigation. When opposing Pritzker's

motion, and again when defendant Dopp filed his own motion for summary judgment, the defendants argued that Pritzker failed to exercise his rights under Article 1425 within the period provided by the statute. All of these arguments were rejected by the Court. Many were brought forward after the Court ruled on Pritzker's motion for partial summary judgment and were rejected based on their untimely presentation. Others related specifically to the Dopp/Yari agreement, similarly belated, were nonetheless entertained in the interests of justice. The Court rules on these arguments in the pages that follow.

### 1. Yari's Fulfillment of His Obligations

Dopp contends that Yari undertook an obligation to provide a $3 million line of credit to Dopp, that he failed to provide such a line of credit, and that he therefore only partially performed his obligations under their agreement. Based on this contention, Dopp argues that Yari's share of the proceeds from the Main Case—and consequently Pritzker's right of redemption in regard to Yari's share—should be reduced to one-sixth of what Yari was supposed to receive (since he only provided Dopp with $500,000 in cash).

The contention that Yari undertook to provide a $3 million line of credit to Dopp is refuted by Findings of Fact Nos. 11, 13 and 16 set forth above.[21] Under the July 23 Agreement, Yari assumed only the obligation to "cooperate" with Dopp to establish a one year line of credit in Dopp's name by serving as a guarantor of the line of credit. The fact that Yari was not required to *provide* a $3 million line of credit is confirmed by the fact that after his efforts to do so were unavailing the parties entered into the September 24 modification which ratified that the parties "fully intend to move forward with the present [July 23] Agreement despite the fact that a line of credit may not be obtainable." Such an agreement between Dopp and Yari is

---

**20.** The Amendment states that Dopp will pay his attorneys "twenty five percent (25%) of all amounts awarded by judgment, settlement or otherwise on the Pritzker Litigation." The "Pritzker Litigation" is defined within the instrument as Civil Case No. 88–1420.

**21.** Dopp's contention that his contract with Yari was a "personal services" contract is disposed of

by Finding of Fact No. 11 and the Court sees no need to further discuss the issue. The related contention that by redeeming the credit obtained by Yari Pritzker somehow assumed Yari's continuing obligation to fund Dopp's lawsuit against Pritzker is absurd and flatly inconsistent with the purposes of Article 1425.

plainly inconsistent with a claim that Yari's failure to obtain a line of credit constituted a breach of their original Agreement.

After Yari was unable to secure a line of credit for Dopp, the parties jointly and voluntarily took steps to alter their agreement. The modification which they executed provided that Yari's obligations would be altered so that he would be required to provide cash advances to Dopp—rather than securing a $3 million line of credit—in an amount likely to total slightly more than $1 million. A September 16, 1992 correspondence from Dopp to Yari suggested that since Yari's obligations were to be altered, the schedule of payments from the profits obtained in the Main Case should also be altered. The suggestion in Yari's letter is consistent with the parties' original intentions and the agreement's basic purpose. The fact that Dopp and Yari agreed to alter the terms of their original agreement did not alter its basic purpose—to provide Yari with a share of the proceeds from the Main Case in return for consideration provided to Dopp.

The relationship between Yari and Dopp is complicated and was in flux as the Litigated Credits Case progressed; however, when viewed through the only relevant lens in this case, Article 1425, its effects are quite simple. The July 23 Agreement, standing alone and as amended by the September 24 modification, is an agreement falling under the terms of Article 1425. Pritzker has a right to redeem the interest obtained by Yari under the agreements for the price he paid plus legal costs and interest. As the relationship between Dopp and Yari now stands, Yari has complied with all of his obligations under his agreements and would be entitled to those proceeds promised him under the terms of the Agreement as qualified hereinafter. By making a valid tender of the amounts paid by Yari, with court costs and interest, Pritzker is entitled to extinguish Dopp's recovery in the Main Case in an amount equal to the proceeds to which Yari was otherwise entitled, adjusting the percentages to reflect the lesser obligation assumed by Yari, if any, and the monies which were actually disbursed by Yari.

## 2. Pritzker's Obligations

At an earlier stage in this case, Yari asserted that Pritzker could not utilize Article 1425 to extinguish the rights created under the Dopp/Yari agreement because of its "executory" nature, involving continuing obligations to provide litigation funding, advice and consultation which Pritzker could not assume. This argument was rejected by the Court through a ruling issued from the bench during the June 10 proceedings.[22] Now Yari asserts that even if Article 1425 is appropriately applied to executory contracts Pritzker failed to make a proper tender to Yari by failing to assume his obligations to fund Dopp's litigation. This latest defense must fail.

■ Under Article 1425, Pritzker's reimbursement of the price paid by Yari, plus interest and expenses, extinguishes the litigated credit. Contrary to the defendants' claims, Pritzker does not become "subrogated" to Yari's rights and obligations. *See* García Cantero, *Comentarios al Código Civil y Compilaciones Forales,* Dirigidas por Manuel Albadalejo (Revista de Derecho Privado 1980) Tomo XIX p. 699–700 (commentary on Article 1535 of the Spanish Civil Code). Pritzker does not assume Yari's obligations and is required to do no more to redeem the credit than to reimburse the price actually paid, plus interest and expenses. The defendants argue that if Pritzker is not required to assume Yari's ongoing responsibilities, Dopp is deprived the benefit of his bargain with Yari. This may be so. But this situation is a direct result of the fact that Dopp and Yari entered into an agreement which created an interest which Pritzker has a right to redeem under Puerto Rico law.[23]

---

**22.** The Court held:

If the Court were to rule that Article 1425 did not apply to executory contracts or installment contracts, Article 1425 would be dead. All parties interested in speculating in litigation would arrange their agreements accordingly. This Court is not in the business of wiping an important statute, reflecting an important public policy, off the books.

**23.** The courts of Louisiana, in applying the provision of the Louisiana Civil Code which is analogous to Article 1425, have reached the same conclusion. *Accord Calderera v. O'Carroll,* 551

### 3. Pritzker's Redemption

Pritzker's essential allegation that the agreements between Dopp and his investors are subject to the provisions of Article 1425 has weathered a storm of counter arguments.[24] The Court has rejected all of these arguments and held steadfast to its finding that the agreements *are* subject to redemption under Article 1425. Nonetheless, upon viewing together several of the arguments made by Dopp and Yari in regard to their agreement, the Court finds that this is one of the rare situations in which the whole of their position may be worth a bit more than the sum of its parts. Although none of the arguments, standing alone, is sufficient to undermine the application of Article 1425 in this case, they do present important matters which must be taken into account. First, in response to Pritzker's Motion for Summary Judgment filed in January, both Dopp and Yari argued that their agreement should not be deemed to be covered by Article 1425 because it was entered into for the valid purpose of providing Dopp with funds to maintain his action against Pritzker. The Court rejected this argument on grounds that "Article 1425 itself reflects a policy decision to prohibit all transfers of litigious credits, regardless of the possibly valid reasons for consummating such transfers." Opinion & Order of March 5, 1993, at 14. The Court's ruling was also based on several other concerns which it did not at that time articulate. First, the Court was mindful of the possibility that interpreting an exception to Article 1425 for agreements intended "to provide funds to maintain litigation" would swallow up the rule itself. In addition, the Court was wary of the possibility that, if accepted, such an exception could be subject to abuse, as it would likely be asserted in all cases in which an agreement is alleged to be subject to the terms of Article 1425, regardless of whether the true intention of the parties to the agreement was to provide funds for litigation. The Court remains confident that these concerns dictate that such an exception seeking to block the application of Article 1425 in its entirety must not be recognized. Nevertheless, the Court is sensitive to Dopp's need to obtain funds to maintain his action against Pritzker.[25] Moreover, it is undisputed in this case that at least two of the payments made by Yari to Dopp—the advance of $50,000 in early December 1992 and the advance of $50,000 in March 1993— *were* made to pay specific litigation expenses.

Second, in this Opinion & Order, the Court has rejected Dopp's allegation that Yari failed to perform fully his obligations under their agreement. *See supra* Part VIII.D.1. Nonetheless, although Yari technically complied with the terms of his agreement with Dopp, he did not succeed in providing what he originally intended. As a result, Dopp never received what he hoped he had bargained for under the agreement. This situation was complicated by two matters: first, the agreement modified in what appears to have been an incomplete fashion; second, it called for continuing performance by Yari which was interrupted by the filing of the Litigated Credits Case. If the relationship between Dopp and Yari had proceeded without interference, it appears they would have settled on an agreement through which Yari would have provided Dopp with cash advances worth slightly more than $1 million. Because it did not proceed without interference, this agreement was never formalized and Yari provided only $450,000.

The Court has struggled mightily with the question of how to deal with these matters.

So.2d 824, 826 (La.App. 3d Cir.1989), *cert. denied,* 556 So.2d 60 (1990) ("The code article does not speak in terms of what the seller of the litigious right has expectations of receiving. It only speaks of reimbursement to the purchaser of the price."); *Martin Energy Company v. Bourne,* 598 So.2d 1160, 1162 (La.App. 1st Cir.1992) (where litigated credit sold for $10 and "other valuable services," redeemer need only reimburse purchaser for the $10 actually paid).

**24.** Most of these counter arguments are collected in a Motion for Reconsideration filed by Dopp on July 27, 1993 (docket no. 107). This motion, which simply rehashes defenses previously considered and rejected, is hereby DENIED.

**25.** Dopp has struggled, and will continue to struggle, in his efforts to obtain financing for this litigation. Pritzker is a billionaire who could never be forced to relent in his defense. This litigation is almost sure to continue and Dopp will again be faced with the need for funds.

Article 1425 and its construing case law provides no guidance. The Dopp/Yari agreement is far outside of the heartland of agreements contemplated by the legislature when it enacted Article 1425. It is likely that the lawmakers did not envision the possibility of a case like this. Property and assets have traditionally been mortgageable to protect and preserve their value. In this case, the lawsuit's worth is an asset which requires expenditures for the services of attorneys and experts, as well as for other general costs of litigation to preserve its value. To apply Article 1425 without allowing for adjustments to reflect expenditures that have permitted the lawsuit to survive would be to deplete and maybe extinguish altogether the value of the lawsuit; this could not have been the intention of the legislation. The Court therefore can refer only to the general intention of the legislature as reflected in the statute which it passed. Based on these principles, the Court **FINDS** that Pritzker cannot be allowed to redeem the entire amount of the credit transferred to Yari. Pritzker cannot be unjustly advantaged because of the peculiar facts of this case. The interests of justice dictate that his right to redeem the credit held by Yari be reduced by half.

### E. Conclusions of Law

Based on the foregoing legal standards and Findings of Fact, the Court enters the following Conclusions of Law:

1. In return for tendering to Lincoln Realty $51,650 to cover the principal amount paid by Lincoln Realty to Dopp plus legal interest, Pritzker is entitled to extinguish eight percent of Dopp's recovery in the Main Case to the extent it exceeds $2 million—or *$1,867,470.35* of Dopp's recovery under the full damages theory.[26]

2. In return for tendering to Baird, Patrick & Co. $107,376 to cover the principal amount paid by BPC to Dopp plus legal interest, Pritzker is entitled to extinguish five percent of Dopp's recovery in the Main Case—or *$1,267,168.97* of Dopp's recovery under the full damages theory.[27]

3. Under the terms of the Amendment to Ratification and Assignment, Ledesma, Palou & Miranda are entitled to recover 25 percent of the verdict and Judgment in this case, Civil Case No. 88–1420—or *$6,335,844.85*.[28]

4. In return for tendering to Bob Yari $450,000 to cover the principal amount paid by Yari to Dopp (prior to Pritzker's prosecution of the Litigated Credits Case) plus legal interest and fees, Pritzker is

**26.** Dopp's allegations that Section 4(b) of his agreement with Lincoln Realty made its eight percent interest subject to the prior subtraction of the 25 percent interest held by Ledesma Palou & Miranda ("LPM") through a contingency fee agreement is rejected based on the plain language of the contract. His allegation that Pritzker's rights are subject to a decision in a case filed in New Jersey regarding the Dopp/Lincoln Realty Agreement is also rejected. First, the contention has not been presented in a fashion sufficient to allow the Court to make a meaningful determination· of its merits. Moreover, it appears clear that any decision rendered by the New Jersey court will not consider the agreement in the light of Article 1425 and is therefore irrelevant to this case.

**27.** Dopp's contention that BPC's five percent share must be determined after subtracting LPM's contingent fee, Lincoln Realty's share and Dopp's litigation expenses, is also rejected based on the plain language of the contract. The agreement is unambiguous on this point and any attempt to alter its terms based on other correspondence between the parties is not permitted.

**28.** Pritzker has argued that LPM's fee cannot be computed based on Dopp's full recovery in the Main Case because under the terms of Article 1425 the credits which Pritzker can redeem are literally *extinguished* from Dopp's recovery. The effect is that a portion of Dopp's recovery simply never existed. In addition, Pritzker argues that LPM cannot collect on a contingent basis a percentage of money not actually realized by their client. The Court rejects this proposition. The plain language of the revised contingency agreement states that LPM is to recover 25 percent of Dopp's recovery in the "Pritzker litigation," which is defined as Civil Case No. 88–1420 (JP). Furthermore, the revised agreement could not have been otherwise arranged. It would have been nonsensical for LPM, having already contracted for a contingent fee based on Dopp's recovery in the Main Case, to assume additional responsibilities in the Litigated Credits Case and then allow its fee to be dictated by the results in the later case, which had the potential only of reducing Dopp's recovery. LPM would have been agreeing to assume more work and at the same time receive less money.

entitled to extinguish one-half of the $2.5 million that would have been due to Yari pursuant to Paragraph 5(ii) of the Dopp/Yari Agreement, or $1.25 million, and one-half of the $4,507,534.57 million that would have been due Yari under Paragraph 5(iv) of the Agreement, or $2,253,767.29 [29]—for a total of *$3,503,767.29* under the full damages theory.

5. Pritzker can extinguish Dopp's recovery in the Main Case in the total amount of *$6,638,406.61.*

6. After the payment of $6,335,844.85 to Ledesma, Palou & Miranda, Dopp's individual recovery is *$12,369,127.96* (plus the amounts he has already received from the investors).[30]

## IX. Summary

The Court, in the foregoing Opinion & Order, has issued the following decrees:

1. Pritzker's Motion to Consolidate (Main Case docket No. 545) is hereby **GRANTED.**

2. Pritzker's Motion for Relief from Judgment (Main Case docket No. 537) is hereby **GRANTED** in part.

3. Pritzker's Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial (Main Case docket No. 538) is hereby **DENIED.**

4. Dopp's Motion to Alter or Amend the Judgment as to the Full Damages Remedy (Main Case docket No. 540) is hereby **DENIED.**

5. Dopp's Motion Electing Resolution as his Remedy (Main Case docket No. 552) is hereby **DENIED** as he is not entitled to resolution as a matter of law.

6. Pritzker, because of his temerity in this litigation, is hereby **ORDERED** to pay Dopp pre-judgment interest in the amount of $6,843,379.42 if Dopp elects full damages as his remedy.

7. Pritzker, because of his temerity in this litigation, is hereby **ORDERED** to pay Dopp attorneys fees in the amount of $1.5 million.

8. The Court **ORDERED** the Clerk to enter a Judgment *nunc pro tunc* correcting an error in the Court's April 29 Partial Judgment.

9. Dopp's Motion for Reconsideration dated July 27, 1993, is hereby **DENIED.**

10. In return for tendering to Lincoln Realty $51,650 to cover the principal amount paid by Lincoln Realty to Dopp plus legal interest, Pritzker is entitled to extinguish eight percent of Dopp's recovery in the Main Case to the extent it exceeds $2 million—or *$1,867,470.35* of Dopp's recovery under the full damages theory.

11. In return for tendering to Baird, Patrick & Co. $107,376 to cover the principal amount paid by BPC to Dopp plus legal interest, Pritzker is entitled to extinguish five percent of Dopp's recovery in the Main Case—or *$1,267,168.97* of Dopp's recovery under the full damages theory.

12. Under the terms of the Amendment to Ratification and Assignment, Ledesma, Palou & Miranda are entitled to 25 percent of the verdict and Judgment in this case, Civil Case No. 88–1420—or *$6,335,844.85.*

13. In return for tendering to Bob Yari $450,000 to cover the principal amount paid by Yari to Dopp plus legal interest and fees, Pritzker is entitled to extinguish one-half of the $2.5 million that would have been due to Yari pursuant to Paragraph 5(ii) of the Dopp/Yari Agreement, or $1.25 million, and one-

**29.** Dopp's total recovery in Civil Case No. 88–1420 is $25,343,379.42. Under the terms of the Dopp/Yari Agreement, legal fees were to be deducted first. Subtracting the legal fees of $6,335,844.85 yields a net of $19,007,534.57. The provisions of Paragraph 5(i) are inoperative since the line of credit was never secured. The first $2.5 million was to go to Yari. The next $12 million was to go to Dopp. The remainder above $14.5 million was to go to Yari to the extent it did not exceed $7 million dollars. Since the remainder is 4,507,534.57, which is less than $7

million, the entire amount would have gone to Yari.

**30.** The resolution of the Litigated Credits Case required a determination by the Court of the amount owed by Dopp to his attorneys. As a result, the amount of the attorneys fees payable to LPM has become an integral part of the Court's business. The Court envisions that it will enter a Judgment which will include the payment of attorneys fees to LPM.

half of the $4,507,534.57 million that would have been due to Yari under Paragraph 5(iv) of the Agreement, or $2,253,767.29—or a total of *$3,503,767.29* under the full damages theory.

## X. Remaining Proceedings

The Court hereby enters the following Orders regarding the proceedings which remain in this litigation:

1. Dopp is hereby **ORDERED** to file, on or before September 24, 1993, a Supplemental Motion Regarding Election of Remedies stating whether he intends to:

a. Elect annulment as his remedy and thereby have the Court enter an Order annulling the Stock Subscription Agreement by which he would be entitled to 12 unencumbered shares of HTP Corporation and no other monetary relief other than the attorneys fees ordered in Part VII *supra.*

b. Elect full damages as his remedy and thereby be entitled to an award in the amount of $25,343,339.42, subject to Pritzker's right to extinguish the interests held by Yari, BPC and Lincoln Realty and other provisions as described above.

2. If Dopp elects full damages as his remedy, Pritzker is **ORDERED** to exercise his right to redeem the interests purchased by Yari, BPC and Lincoln Realty, on or before October 15, 1993.[31]

IT IS SO ORDERED.

---

**31.** If Dopp elects full damages and Pritzker exercises his rights under Article 1425, the Court will enter Judgment under the following terms. Pritzker will be order to tender to Dopp the amount of $12,369,127.96 and to tender to LPM the amount of $6,335,379.42. The Clerk of the Court will be ordered to disburse to Lincoln Realty $51,650, to BPC $107,376, and to Yari $450,000 while returning to Pritzker the excess of the funds consigned by him, along with any accrued interest.