November 25, 1994 UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 93-2373

PAUL S. DOPP,
Plaintiff, Appellant,

v.

JAY PRITZKER,
Defendant, Appellee.

Nos. 94-1130
94-1131

PAUL S. DOPP,
Plaintiff, Appellee,

v.

JAY PRITZKER,
Defendant, Appellant.

ERRATA SHEET ERRATA SHEET

The opinion of the court issued on October 28, 1994, is
corrected as follows:

1. On page 25, line 13 delete signal for footnote 12, and
add the following at the end of the sentence (after "$600,000."):
Under the SSA, Pritzker could have exercised the buy-out option
as late as 10 years after the formation of the contract
(withholding any payment until then). There is evidence in the
record, through an expert witness presented by Pritzker, that the
prospect of so long a delay would justify a somewhat lower
figure, reflective of a time-related discount. The expert
testified that this reduction to present value could have brought
the present value of the redemption price as of December 3, 1984,
as low as $114,638.

2. Delete footnote 12 in its entirety and renumber all
subsequent footnotes accordingly.

3. On page 26, line 3 change "the . . . price" to
"$114,638."

4. On page 26, line 4, page 27, line 10, page 29, line 7,
and page 29, line 12 change "$13,686,600" to "$14,171,962."

5. On page 29, line 10 change "$3,313,400" to

"$2,828,038."

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2373

PAUL S. DOPP,
Plaintiff, Appellant,

v.

JAY PRITZKER,
Defendant, Appellee.

Nos. 94-1130
94-1131

PAUL S. DOPP,
Plaintiff, Appellee,

v.

JAY PRITZKER,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Selya and Cyr, Circuit Judges,

and Zobel,* District Judge.

Ruben T. Nigaglioni, with whom Diana Mendez-Ondina and
Ledesma, Palcu & Miranda were on brief, for plaintiff.
Gael Mahony, with whom Frances S. Cohen, David A. Hoffman,
Joshua M. Davis, Hill & Barlow, Salvador Antonetti-Zequeira,
Ricardo Ortiz-Colon, and Fiddler, Gonzalez & Rodriguez were on
brief, for defendant.

October 28, 1994

*Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. In these appeals, we revisit the SELYA, Circuit Judge.

remedial phase of a protracted dispute in which the main

protagonists are a pair of erstwhile partners, Paul S. Dopp and

Jay A. Pritzker. The litigation stems from an oral contract

between the two men concerning the purchase of the Dorado Beach

Hotel Corporation (DBHC), a company that controlled a complex of

hotels and golf courses situated on 1,000 beachfront acres along

the north shore of Puerto Rico.

In an earlier opinion we upheld a jury verdict finding

Pritzker liable to Dopp, but vacated both the jury's damage award

and the trial court's rulings in connection with equitable

relief. See Dopp v. HTP Corp., 947 F.2d 506 (1st Cir. 1991)

(Dopp II). On remand, the district court held a second trial to

determine Dopp's entitlement to various forms of relief. After a

jury returned a series of special findings, see Fed. R. Civ. P.

49(a), the district court entered a revised judgment.

Both sides now appeal.1 Their appeals require that we

examine: (1) whether the district court lawfully denied Dopp

resolution (a form of rescission) as a remedy for contractual

breach; (2) whether the jury's assessment of full damages,

$17,000,000, was either excessive, as Pritzker claims, or too


1The three appeals with which we are concerned today were
consolidated for oral argument with three other appeals arising
out of the same case. Since the latter appeals (Nos. 93-2374,
94-1128, and 94-1129, respectively) involve segregable issues
they focus on a series of financing agreements entered into
between Dopp and three financiers, Robert Yari, Lincoln Realty,
Inc., and Baird Patrick & Co., for the apparent purpose of
funding Dopp's litigatory efforts we will address them in a
separate and subsequent opinion.

4

niggardly, as Dopp asserts; and (3) whether the district court

appropriately awarded Dopp attorneys' fees and prejudgment

interest, based on its determination that Pritzker displayed

obstinacy in conducting the litigation. After a careful

examination of the record and the applicable law, we affirm in

part, reverse in part, and remand.

I. BACKGROUND I. BACKGROUND

We divide this segment of our opinion into two

subparts, treating the facts and the travel of the case

separately. In doing so, we write somewhat sparingly because the

background of the litigation is already well-documented. See,

e.g., id. at 508-09; Dopp v. HTP Corp., 831 F. Supp. 939, 941-42

(D.P.R. 1993) (Dopp III); Dopp v. HTP Corp., 755 F. Supp. 491,

492-94 (D.P.R. 1991) (Dopp I).

A. The Facts. A. The Facts.

In May of 1984, Dopp wangled an option to acquire DBHC

for the approximate price of $40,500,000. He secured the option

with a $2,000,000 letter of credit supplied with the assistance

of Island Resorts, S.A. (IRSA), a Panamanian corporation. The

option agreement specified that the underlying purchase-and-sale

transaction would be consummated no later than December 3, 1984.

Though playing for high stakes, Dopp had relatively few

chips of his own. Thus, he immediately set out in search of

financial backing. He encountered heavy seas. With time running

out, Dopp turned to Pritzker. The parties reached an oral

agreement on November 30, 1984. Under its terms, Pritzker agreed

5

to provide the funds needed to seal the purchase and reimburse

Dopp's and IRSA's costs. In exchange, Dopp agreed that Pritzker

would receive an 80% equity interest in a holding company that

would be formed to acquire DBHC's stock, and, as a sweetener,

that a Pritzker affiliate would be given a long-term contract to

manage the hotels coincident with the closing.

The parties formed HTP Corporation (HTP) to serve as

the holding company. Dopp controlled 20% of HTP's stock in the

first instance, but ceded some shares to IRSA in accordance with

a prior arrangement. In the end, Dopp retained a 12% interest in

HTP. Meanwhile, Pritzker, through a nominee, held an 80%

interest.2

On December 3, 1984, Pritzker presented two documents

to Dopp that supposedly embodied their oral agreement. Pritzker

injected into one of these documents the stock subscription

agreement (SSA) a clause granting the majority shareholder

(Pritzker) an option to retire the stock held by the two minority

shareholders (Dopp and IRSA) for $50,000 per share, or $1,000,000

in the aggregate, at any time within 10 years. With the purchase

option due to expire, the move put Dopp at a huge disadvantage.

He signed the documents.

After HTP obtained a one-day extension from the seller,

it closed the underlying transaction on December 4, 1984. HTP

bought DBHC's stock for $36,846,000, net of adjustments; the


2For ease in reference, we ignore the nominee, a shell
corporation, and treat Pritzker as if he, himself, were the
majority shareholder.

6

seller canceled the letter of credit; Pritzker reimbursed Dopp

and IRSA for expenses advanced ($710,000); and Dopp received a

prearranged $200,000 "consulting fee."

B. The Litigation. B. The Litigation.

In mid-1988, Dopp initiated a diversity suit in the

United States District Court for the District of Puerto Rico,

naming Pritzker, HTP, and several others as defendants. He

alleged, inter alia, that the buy-out option in the SSA

contravened the oral contract, and that his consent to the SSA

had been unfairly procured. After a 10-day trial, a jury found

in Dopp's favor, determining that the parties had formed an oral

contract on November 30, 1984, and that, thereafter, Pritzker had

employed deceit and duress to pressure Dopp into signing the SSA,

thereby violating the oral contract. Based on these

determinations, the jury awarded Dopp $2,000,000 in damages.

Thereafter, the district court, acting in response to Dopp's

motion under Fed. R. Civ. P. 59(e), declared the SSA null and

void in respect to Dopp's shares in HTP, but declined to order

resolution of the oral contract.3

The first trial produced no fewer than ten appeals.

After considering them, we upheld the liability determination but

vacated both the damage award and the district court's remedial

rulings, see Dopp II, 947 F.2d at 520. We then remanded for


3Resolution is a remedy that, under Puerto Rico law,
operates in much the same way as rescission. See P.R. Laws Ann.
tit. 31, 3052 (1991); see also Dopp II, 947 F.2d at 510-11. We
discuss the nature of the remedy at greater length in Part II(A),
infra.

7

further relief-related proceedings, indicating that, "assuming a

competent evidentiary predicate, the jury may be instructed on,

and asked to determine, variously: (1) full damages . . .; (2)

the amount of accessory damages, if any, [pursuant to annulment]

. . .; and (3) the amount of accessory damages, if any, [pursuant

to resolution] . . . ." Id. at 519. We also observed that

"annulment and resolution are mutually exclusive remedies," and

that "the plaintiff may or may not . . . satisfy the district

court that he is entitled to an order for resolution of the Oral

Contract." Id. at 520.

On March 27, 1993, a second jury rendered a series of

special findings. The jury fixed the amount of full damages at

$17,000,000, and the amount of damages ancillary to resolution

(if resolution were ultimately ordered) at either $19,621,000 or

$210,071,000, depending on whether the court might order

resolution in natura or in kind. See Dopp III, 831 F. Supp. at

942 & n.5. The jury determined that, if Dopp elected annulment,

there would be no accessory damages. See id.

On September 9, 1993, the district court made certain

supplementary rulings. Among other things, the court denied

Pritzker's motions for judgment as a matter of law and for a new

trial; put a damper on Dopp's quest for resolution; rejected

Dopp's motion to alter or amend the judgment; upheld the jury's

assessment of full damages; and awarded Dopp prejudgment interest

8

and attorneys' fees.4 See id. at 943-52. These appeals ensued.

II. RESOLUTION II. RESOLUTION

In our earlier opinion, we determined that up to three

main remedies might be available to Dopp, namely, annulment of

the SSA, resolution of the oral contract, or full damages. Dopp

II, 947 F.2d at 519. We noted that, in the event Dopp achieved

either annulment or resolution, the jury might also award

accessory damages. See id. We defined the third remedy, "full

damages," as comprising "the amount of damages which would make

Dopp whole in the absence of either annulment or resolution . . .

." Id. Withal, we cautioned that the availability of any given

remedy depended upon the existence (or nonexistence) of a

"competent evidentiary predicate." Id.

At the second trial, Judge Pieras instructed the jurors

as to each of these three remedies and commanded them to

determine on a contingent basis the amount of money damages, if

any, that each anodyne actually would entail. The jurors

complied. Following the jury's calculation of potential damages,

the judge asked Dopp to elect a remedy. Dopp chose resolution.

Much to his dismay, the district court ruled that, given the

evidence, resolution was unobtainable. Under protest, Dopp then

elected an alternate remedy: full damages. He now beseeches us



4The district court also made a number of rulings in regard
to third parties who claimed an interest in the proceeds of the
litigation through prior arrangements with Dopp. See Dopp III,
831 F. Supp. at 952-59. We leave these rulings to one side for
present purposes, intending, however, to deal with them in due
course. See supra note 1.

9

to reverse the district court's denial of resolution.

In order to respond to Dopp's importunings, we must

determine the nature of resolution under Puerto Rico law, settle

upon the proper standard of review, consider whether the court

below paid sufficient homage to the lessons of Dopp II, and,

finally, evaluate the sturdiness of the district court's ruling.

A. Legal Principles. A. Legal Principles.

The remedy of resolution emanates from article 1077 of

the Puerto Rico Civil Code, which reads in pertinent part:

The right to rescind the obligations is
considered as implied in mutual ones, in case
one of the obligated persons does not comply
with what is incumbent upon him.

The person prejudiced may choose between
exacting the fulfillment of the obligation or
its rescission, with indemnity for damages
and payment of interest in either case. He
may also demand the rescission, even after
having requested its fulfillment, should the
latter appear impossible. . . .

P.R. Laws Ann. tit. 31, 3052 (1991).

It is noteworthy that "[n]ot every breach of a

contractual obligation gives rise to a resultory action under

article 1077." Dopp II, 947 F.2d at 510-11. To pave the way for

the remedy, the unfulfilled obligation must be reciprocal in

nature. See id. at 511. Reciprocity inheres when "there are

obligations and correlative obligations so interdependent between

themselves that one is the consequence of the other, and the

performance of said obligation by a contracting party constitutes

the motive of the contract for the other party, and vice versa."

Ponce v. Vidal, 65 P.R.R. 346, 351 (1945). That is, reciprocity

10

is basically a way of saying that a particular obligation

exhibits both mutuality and essentiality what one might term

"mutual essentiality." This concept embodies the notion that, in

the absence of a particular mutual obligation, the contract would

never have come into being, and, thus, should cease to exist.

The Supreme Court of Puerto Rico recently fleshed out

this idea, observing that

not every failure to comply with a mutual
obligation will have the effect of
terminating the contract. For this to be the
case, the unmet obligation must be an
essential obligation or fulfillment of the
obligation must constitute the motive that
induced the other party to enter into the
contract.

Ramirez v. Club Cala de Palmas, D.P.R. , 89 J.T.S. 22

(1989) (revised official translation). Put bluntly, "the

unfulfilled obligation must be the principal one." Id.

The Ramirez court likewise emphasized the overarching

concern of article 1077: that contracts, if and when possible,

be preserved and ultimately fulfilled. See id. This is the

"higher interest" served by a narrow construction of the element

of reciprocity. Id. From all that we can discern, then, Article

1077 is a remedy of last resort, reserved for situations in which

a party's breach dissipates the very essence of a contract.

B. Standard of Review. B. Standard of Review.

We think it follows from this characterization that the

applicability of article 1077 in a given case presents a mixed

question of law and fact. The Puerto Rico Supreme Court has

identified reciprocity as the key principle on which article 1077

11

rests. See Vidal, 65 P.R.R. at 351. And though reciprocity

itself is wholly a legal construct, its existence in any

particular contractual setting is almost entirely contingent on

the determination of a series of essentially factual questions,

e.g., the subject matter of the contract, the context in which it

arose, the parties' intentions, their course of conduct, and the

like. See id. (describing reciprocity as a function of the

"character" of a particular obligation).

Indeed, to the extent that reciprocity actually resides

at the intersection of mutuality and essentiality, its

characterization as a mixed question of law and fact becomes

virtually unavoidable. Essentiality is closely akin to, if not a

species of, materiality, and courts and commentators have long

recognized that materiality is primarily a question of fact, the

resolution of which is necessarily a function of context and

circumstances. See, e.g., Gibson v. City of Cranston, F.3d

, (1st Cir. 1994) (No. 94-1375, slip op. at 8-9); see also

3A Arthur L. Corbin, Corbin on Contracts 700, at 309-10 (1960 &

Supp. 1992) (noting that whether a party's breach "go[es] to the

`essence'" of the contract is a function of weighing various

factors); 2 E. Allan Farnsworth, Farnsworth on Contracts 8.16,

at 443 (1990) ("Whether a breach is material is a question of

fact.").

Putting the issue into this perspective has salient

implications for appellate oversight. "The standard of review

applicable to mixed questions usually depends upon where they

12

fall along the degree-of-deference continuum: the more fact-

dominated the question, the more likely it is that the trier's

resolution of it will be accepted unless shown to be clearly

erroneous." In re Howard, 996 F.2d 1320, 1328 (1st Cir. 1993);

see also Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993)

("The clearly erroneous standard . . . ordinarily applies when we

review a trial court's resolution of mixed questions of law and

fact.").

Here, the fact-specific nature of the inquiry into

resolution demands that we accept the district court's findings

unless they are shown to be clearly erroneous.5 In practical

terms, this means that the findings will hold sway unless, after

reading the whole record and making due allowance for the trier's

superior insights into credibility, the reviewing court

unhesitatingly concludes that a mistake has been made. See



5Referring to the district court's statement that Dopp was
"not entitled to resolution as a matter of law," Dopp III, 831 F.
Supp. at 959, Dopp suggests that our review should be de novo.
See, e.g., McCarthy v. Azure, 22 F.3d 351, 354 (1st Cir. 1994)
(holding that questions of law engender plenary appellate
review). We reject the suggestion. On close perscrutation, it
is plain that Judge Pieras reached his conclusion about Dopp's
lack of entitlement to resolution as a result of a case-specific,
fact-dominated decisional process. See Dopp III, 831 F. Supp. at
946-50. The words contained in a district court's ruling must be
"read in context" and judged by their "cumulative import."
United States v. Tavano, 12 F.3d 301, 304 (1st Cir. 1993).
Mindful that the law does not require district courts to be
letter-perfect in their syntax or choice of phraseology in
matters of word usage, we have repeatedly acknowledged that "an
appellate court must not hesitate to excuse an awkward locution
and give a busy trial judge a bit of breathing room," Lenn v.
Portland Sch. Comm., 998 F.2d 1083, 1088 (1st Cir. 1993) (citing
other cases) we refuse to sacrifice substance on the altar of
form.

13

Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453,

457 (1st Cir. 1992); Cumpiano v. Banco Santander P.R., 902 F.2d

148, 152 (1st Cir. 1990); see also Fed. R. Civ. P. 52(a). In the

last analysis, the clear-error rubric betokens a "highly

deferential mode[] of review." Howard, 996 F.2d at 1327.

Of course, "Rule 52(a) does not inhibit an appellate

court's power to correct errors of law, including those that may

infect a so-called mixed finding of law and fact, or a finding of

fact that is predicated on a misunderstanding of the governing

rule of law." Bose Corp. v. Consumers Union of U.S., Inc., 466

U.S. 485, 501 (1984). But, here, although Dopp argues for de

novo review, he has not shown that any error of law influenced or

otherwise tainted the district court's findings of fact.

Although he repeatedly describes the court's findings in terms of

legal, rather than factual, error, merely calling a dandelion an

orchid does not make it suitable for a corsage. As we have

remarked before, "[t]he clearly erroneous rule cannot be evaded

by the simple expedient of creative relabelling." Reliance Steel

Prods. Co. v. National Fire Ins. Co., 880 F.2d 575, 577 (1st Cir.

1989).

We have said enough on this score. Since "we will not

permit parties to profit by dressing factual disputes in `legal'

costumery," id., we think that, with one exception, we must

subject the district court's denial of a resultory remedy to

clear-error review. Before doing so, however, we visit the

exception.

14

C. Law of the Case . . . Not! C. Law of the Case . . . Not!

Dopp boldly contends that the district court failed to

recognize the law of the case. A contention that the law of the

case precludes reexamination of an issue raises a pure question

of law, and, thus, engenders plenary review. See McCarthy v.

Azure, 22 F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v.

Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992).

Dopp's "law of the case" argument prescinds from a

wildly optimistic reading of our earlier opinion an opinion

that, in Dopp's view, directed the district court to grant him

resolution. In support of this claim, Dopp adverts to our

general discussion of article 1077, both in terms of its possible

(past) role in the first jury's determination of damages, see

Dopp II, 947 F.2d at 513-14, and in terms of its possible

(future) role in the jury trial to be held following remand, see

id. at 510-11, 519.

To be charitable, Dopp reads our language through rose-

colored glasses, ignoring the forest and focusing self-

interestedly on a few isolated trees. In the bargain, he

cavalierly wrests phrases from their analytical context,

disregarding the wise adage that the words contained in judicial

opinions "are to be read in light of the facts of the case under

discussion." Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944).

The whole purpose of our original analysis was to ascertain,

assuming that Article 1077 might have applied, on what theory the

judge and jury could have generated the determination of damages.

15

We lamented that the actual basis for the damage award was

"completely uncertain," Dopp II, 947 F.2d at 513, and that the

record revealed "rampant confusion over what relief was

warranted," id. at 516. In short, our earlier opinion shows

beyond hope of contradiction that we decided nothing in regard to

the ultimate applicability of a resultory remedy.

The sockdolager is that Dopp's "law of the case"

argument entirely ignores both our prediction that at a second

trial Dopp "may or may not . . . satisfy the district court that

he is entitled to an order for resolution of the Oral Contract,"

and our straightforward declaration that we "intimate no view" as

to the eventual outcome of this question. Id. at 520. The words

could not be plainer or more explicit. Given this express

disclaimer, it is fanciful for Dopp to suggest that we bound the

lower court to an award of resolution the second time around.

D. Analysis. D. Analysis.

Having exposed Dopp's threshold contention as baseless,

we now confront the critical question: did the district court

commit clear error in denying Dopp the remedy of resolution?

Based on a painstaking review of an amplitudinous record, we

think not.

Under the Civil Code, resolution requires more than

merely proving the nonfulfillment of some mutual obligation

contained in a bilateral contract. Rather, the unfulfilled

obligation must be "essential" to the contract, or, phrased

another way, the contemplated fulfillment of the obligation must

16

have constituted the contract's raison d'etre. The Ramirez court

put the point succinctly, stating that resolution cannot be

grounded in the nonfulfillment of "accessory" or "complementary"

obligations obligations that the court described as those which

"do not constitute the real consideration for executing a

contract and which are incorporated into the same to complete or

clarify the contracting parties' stipulations." Ramirez, 

D.P.R. , 89 J.T.S. 22 (citing Del Toro v. Blasini, 96 P.R.R.

662 (1968); Velez v. Rios, 76 P.R.R. 806 (1954); Vidal, 65 P.R.R.

346 (1945)). While the breach of such an accessory or

complementary obligation "may trigger an action for damages or

any other action that the circumstances of each case warrant,"

such a breach may "never" give rise to a rescissory action. Id.

(emphasis in original). This is so, the court said, because

"[t]he requirement that the unfulfilled obligation be the

principal one serves a higher interest . . . that promotes the

fulfillment of contracts, and that prevents that, by a lesser

breach of contract, one of the parties may release himself from

the obligation, either because he is no longer interested or

because the contract does not suit him anymore." Id. (citing 1

Diez Picaso, Fundamentos del Derecho Civil Patrimonial 859 (2d

ed. 1983)).

The question of whether Pritzker's provision of an

unencumbered, as opposed to encumbered, 12% interest in HTP

constituted either an essential obligation of his bargain, or the

motive that induced Dopp to enter into the contract, is not

17

necessarily subject to a simple, categorical answer. This very

uncertainty is, in itself, a good indicator that the district

court's answer, whether affirmative or negative, is not likely to

be clearly erroneous.

In any event, we discern no clear error here. Judge

Pieras, quoting Dopp's own testimony, determined among other

things that "[p]roviding Dopp with an unencumbered . . . equity

interest in HTP is not a reciprocal obligation of the Oral

Agreement assumed by the defendant. Indeed the plaintiff `fully

expected that there would be some reasonable option' and

therefore did not rely on the absence of an option clause to

enter into the Oral Agreement." Dopp III, 831 F. Supp. at 950

(emphasis in original). We believe that this assessment of

Dopp's actual expectation is supportable, and that it alone is

sufficient to ground a principled conclusion that the parties

regarded the element of non-encumbrance as an incidental, rather

than an essential, obligation of their contract. If it is true

that Dopp, prior and pursuant to the formation of the oral

contract, "fully expected that there would be some reasonable

option" as he, himself, testified and yet proceeded to the

written contract phase without settling this matter precisely, it

seems eminently reasonable for a factfinder to conclude that the

element of non-encumbrance could not have been the raison d'etre

of the oral contract.

What is more, the plausibility of this conclusion rests

not only on Dopp's own words, but also on other witnesses'

18

testimony to the effect that, when ownership is closely held,

buy-out options are a regular attribute of intra-corporate

arrangements. For our part, we regard this truth to be self-

evident; indeed, it is difficult to imagine an 80% shareholder of

a close corporation owning extremely valuable assets who would

not routinely demand such protection. Pritzker may have been

many things, but, as Dopp well knew, he was neither a neophyte

nor an altruist. Hence, Dopp could not reasonably have expected

that Pritzker would forgo so elementary a precaution and leave

the minority stock unfettered.

The interest in preservation and ultimate fulfillment

of contracts that drives article 1077, see Ramirez, P.R. Dec.

, 89 J.T.S. 22, does not suggest a contrary result. Here,

Pritzker's breach did not render the contract inherently infirm.

To be sure, the breach harmed Dopp, but his insistent focus upon

the harm begs the real question. The critical determinant of the

availability of a resultory remedy is neither the fact nor the

magnitude of the inflicted injury, but, rather, whether the

defaulting party's breach irretrievably undermined the contract.

In this instance, the district court thought not; and we can

scarcely conclude, based on the evidence presented, that its

decision was clearly erroneous.

In a last-ditch effort to turn the tide, Dopp insists

that the unreasonableness of the particular buy-out clause that

Pritzker inserted into the SSA somehow transmogrifies an

accessory obligation into an essential obligation. We do not

19

agree. If the obligation to produce an unencumbered 12%

ownership interest was not essential before and at the time of

the oral contract and, as we have pointed out, there is

adequate evidence to support a conclusion to that effect then

it does not matter that the obligation took on added importance

as time went by and circumstances changed.

Dopp's other arguments on this issue do not require

comment. For the reasons set forth herein, we uphold the

district court's finding that the obligation shirked by Pritzker

lacked mutual essentiality. Accordingly, we affirm the denial of

resolution.

III. FULL DAMAGES III. FULL DAMAGES

Because Dopp was not legally entitled to resolution,

his contingent election of an alternative remedy full damages

is both valid and binding. Withal, both parties question the

amount of the damage award. To answer these queries, we must

examine whether the district court correctly instructed the jury

as to the relevant measure of damages and, if so, whether the

jury's resultant rendition of full damages passes muster.

A. The Trial Court's Instructions. A. The Trial Court's Instructions.

Under Dopp's rather imaginative theory of the case,

full damages, properly computed, total $60,581,000. He contends

that the verdict on full damages undershot this target because a

pinchpenny trial court charged the jury in too restrictive a

manner. Branding those instructions as contradictory to the

teachings of Dopp II and characterizing them as "poorly thought-

20

out and convoluted," Dopp asks us to set aside the verdict and

mandate further proceedings.6 We conclude that the court did

not commit reversible error in framing its jury instructions.

Our analysis begins, as it must, with the text of the

district court's charge. In relevant part, the judge told the

jury:

First you must render a verdict as to the
amount of the full damages to which Dopp is
entitled based on Pritzker's breach of the
oral contract. . . . Full damages reflect
the amount, if any, that is necessary to
compensate Dopp in the event that he does not
elect to have the Court enter an order of
annulment. They reflect the amount necessary
to put Dopp in as good a position as he would
have been if the oral contract had been fully
performed so that his shares were not being
encumbered by the SSA's buy-out clause. The
amount of full damages are [sic] therefore
the difference between the value of what he
was promised under November 30, 1984 oral
contract and the value of what he actually
received from Pritzker under the December 3,
1984 stock subscription agreement.

As we read these words, we believe that the court indicated, in

essence, that full damages consisted of the monetary cost of

encumbrance, that is, the value of what Dopp had a legitimate

right to expect (a 12% interest in HTP, not encumbered in any

unorthodox way) less the value of what he actually received (a



6Dopp also insists that in addition to taking other
corrective action, we should annul the SSA. He is barking up the
wrong tree. If Dopp desired annulment, he could have elected
that remedy below. See Dopp II, 947 F.2d at 519. He did not do
so. See Dopp III, 831 F. Supp. at 942. Absent such an election,
Dopp cannot pursue annulment on appeal. Nor is this outcome
unconscionable; as a general legal principle, "[p]arties cannot
have their cake and eat it, too." United States v. Weston, 960
F.2d 212, 215 (1st Cir. 1992).

21

12% interest in HTP, subject to a particularly onerous

encumbrance), measured at the time of the breach (December 3,

1984).

Dopp disagrees. He posits on appeal, as he did

below,7 that the true measure of full damages is the value of

the purchase agreement plus a disgorgement premium referable to

Pritzker's wrongful possession. In support of this theorem, Dopp

directs our attention to certain language contained in Dopp II,

to article 1255 of the Civil Code, P.R. Laws Ann. tit. 31, 3154

(1991), and to "[a]n intuitive sense that an injustice is

inherent in the District's Court's formulation . . . ." Because

these exhortations boil down to a claim that the district court

misapprehended the substantive law on damages, appellate review

is plenary. See Losacco v. F.D. Rich Constr. Co., 992 F.2d 382,

384 (1st Cir.), cert. denied, 114 S. Ct. 324 (1993); see also

McCarthy, 22 F.3d at 354.

Despite the freedom inherent in plenary review and the

generosity of our efforts, we are unable to discern a cognizable

legal basis on which Dopp's remedial theory might rest. In

particular, we find baffling Dopp's invocation of our earlier

opinion. Nothing contained therein suggests, by any stretch of

the most elastic imagination, that full damages for purposes of

this case could constitute anything more than the cost of



7Dopp properly preserved his rights anent the challenged
instructions, making a timely objection as required by Fed. R.
Civ. P. 51. He also moved to alter or amend the judgment on this
ground, in pursuance of Fed. R. Civ. P. 59(e).

22

encumbrance. Indeed, we specifically defined full damages as

"the amount of damages which would make Dopp whole in the absence

of either annulment or resolution," Dopp II, 947 F.2d at 519, and

the district court's formulation fits neatly within this

integument. Moreover, it is virtually a hornbook restatement and

application of the concept of contractual wholeness. See John D.

Calamari & Joseph M. Perillo, The Law of Contracts 14-4, at 591

(3d ed. 1987) ("For breach of contract the law of damages seeks

to place the aggrieved party in the same economic position he

would have had if the contract had been performed."); 3

Farnsworth on Contracts, supra, 12.1, at 147 ("[C]ourts

encourage promisees to rely on promises . . . [o]rdinarily . . .

by protecting the expectation that the injured party had when

making the contract by attempting to put the injured party in as

good a position as that party would have been in had the contract

been performed, that is, had there been no breach.").

Nor need we tarry over Dopp's second source of

"support" for his theorem. This so-called source article 1255

of the Civil Code is simply not supportive of Dopp's position.

As its text makes clear, article 1255 is relevant only "[w]hen

the nullity of an obligation has been declared." P.R. Laws Ann.

tit. 31, 3514 (1991). That is not the situation here.

Dopp's hole card his stated reliance on his

"intuitive sense" of "injustice" does not shore up his hand.

The plea that it embodies lies beyond the cognizance of this

court, which necessarily deals in the concreteness of fact, law,

23

and logic, not the fluidity of pathos and intuition. Absent a

demonstration of legal error and Dopp has offered none we

must uphold the district court's charge on damages.8

B. The Amount of Damages. B. The Amount of Damages.

Using the formula given in the trial court's

instructions, the jury calculated Dopp's full damages to be

$17,000,000. Pritzker, for his part, is satisfied with the

court's instructions but not with the amount of damages. He

argues that the verdict is not rationally based on the evidence

presented and, hence, that the district court erred in refusing

to grant his motion for a new trial. In stark contrast, Dopp

contends that the amount is far too scant, and that even "[i]f

the jury did exactly that which the district court stated it

could reasonably do," its verdict should have been in the

vicinity of $39,400,000.

Dopp's contention appears to be no more than a

recasting of his complaints about the charge, see supra Part

III(A), and, at this point, the caterwauling may be rejected out

of hand. Pritzker's contention, however, raises serious

concerns.


8This ruling reflects not only Dopp's inability to discredit
the instructions themselves, but also his failure to substantiate
his own, alternative theory of damages. At best, it seems that
his theory, which proposes that full damages should include at
least the value of the purchase agreement (fixed by the jury in
its special findings at $40,000,000), might be viable if Dopp
proved that he had the capacity to close the deal without
Pritzker's assistance. But the record wholly fails to establish
that fact. Indeed, Dopp offered no such proof, and all
indications are that he lacked the wherewithal to go forward if
Pritzker withheld his financial backing.

24

Because jurors exercise great leeway in evaluating

claims and assessing damages, appeals based on verdict size are

seldom successful. When a disgruntled defendant complains that a

jury award is overgenerous, the verdict ordinarily stands "unless

it is grossly excessive, inordinate, shocking to the conscience

of the court, or so high that it would be a denial of justice to

permit it to stand." Segal v. Gilbert Color Sys., Inc., 746 F.2d

78, 80-81 (1st Cir. 1984) (citations and internal quotation marks

omitted). Even in cases involving purely economic losses (which,

by and large, are more easily quantifiable in dollars and cents

than, say, damages for emotional distress), appellate review is

extremely deferential, evincing a frank recognition that "the

jury is free to select the highest figure for which there is

adequate evidentiary support." Kolb v. Goldring, Inc., 694 F.2d

869, 872 (1st Cir. 1982). Consequently, "such a verdict will be

reduced or set aside only if it is shown to exceed any rational

appraisal or estimate of the damages that could be based upon the

evidence before the jury." Segal, 746 F.2d at 81 (citation and

internal quotation marks omitted).

The rule that emerges is that, within wide limits, an

appellate court must accept a jury's seeming extravagance, even

if the court, left to its own devices, would have returned a

substantially smaller verdict. See Kolb, 694 F.2d at 871.

Stated another way, while "the jury may not render a verdict

based on speculation or guesswork," Bigelow v. RKO Radio

Pictures, Inc., 327 U.S. 251, 264 (1946), a reviewing court will

25

not tinker with the jury's assessment of money damages as long as

it does not fall outside the broad universe of theoretically

possible awards that can be said to be supported by the evidence.

This deferential standard imposes a correspondingly heavy burden

on parties who challenge the amount of damages awarded by

allegedly overgenerous juries. And, moreover, the weight of the

burden grows heavier when, as now, the trial judge has reviewed

the jury's handiwork and has ratified its judgment. See Ruiz v.

Gonzalez Caraballo, 929 F.2d 31, 34 (1st Cir. 1991).

In this case, the upper edge of the universe of

sustainable awards is defined by the value of the asset owned by

Dopp (the option to acquire DBHC) as of December 3, 1984 (the

date of Pritzker's breach).9 Based on the highest credible

valuations contained in the record, and recognizing the

possibility of nonduplicative aggregation, we conclude that the

jurors could have found DBHC's properties to be worth as much as

$119,055,000 in late 1984. This figure is based upon an

appraisal of the hotel empire conducted by the Merrill Lynch Real

Estate Advisory & Appraisal Group (Merrill Lynch),10 read in


9On that date, Dopp owned an option to acquire DBHC. In
entering the oral contract, however, Dopp in effect agreed to
trade that asset for a 20% interest in DBHC's properties (a
portion of which he would then cede to IRSA). Thus, DBHC becomes
the proper barometer for measuring value.

10While Merrill Lynch issued its appraisal approximately one
year after the transaction closed, the district court admitted it
into evidence, and we think the jury could reasonably have relied
on it. See, e.g., Federal Sav. & Loan Ins. Corp. v. Texas Real
Estate Counselors, Inc., 955 F.2d 261, 268 (5th Cir. 1992)
(upholding factfinder's reliance on later appraisal despite
evidence of changed market conditions).

26

light of testimony by a different expert witness evaluating

certain excess land not included in the Merrill Lynch appraisal.

According to this evidence, the empire had a value of

$110,000,000, and the excess land had a value of $9,055,000.

Hence, the jury lawfully could have valued DBHC's properties, as

a whole, at $119,055,000. In turn, this value is the value of

the asset the purchase option for the acquisition was to be

structured in such a way as to cost Dopp nothing (apart from

cession of an 80% interest in the acquired properties).11 On

this basis, then, a rational jury, apportioning the overall

value, could have concluded that Dopp's anticipated 12% interest

in HTP was worth $14,286,600 on the date of the breach.

Once the jurors determined an asset value, they next

would have needed to determine what portion or percentage of that

value constituted the cost of encumbrance. Taking the evidence

and arguments advanced at trial most favorably to Dopp, we think

that the jury lawfully could have determined that the buy-out

option eliminated virtually all the value of Dopp's 12% interest

in HTP, save only for the meagre price that Pritzker was


11Pritzker argues that the purchase price (roughly
$40,500,000) must be deducted from the value of DBHC before the
value of Dopp's pro rata interest is assayed because the purchase
price constituted an acquisition cost. We can discern no logical
basis for such a deduction. The payment represented Pritzker's
acquisition cost not Dopp's. Dopp did not contribute to it;
instead, he ceded 80% of the equity in the acquiring entity to
Pritzker. That was Dopp's "acquisition cost" and it is fully
accounted for by limiting his recovery to 12% of DBHC's actual
value a value that did not somehow shrink because HTP or
Pritzker tendered the purchase price. Put another way, the value
of DBHC remained more or less the same regardless of the amount
expended for its acquisition.

27

obligated to pay to redeem Dopp's shares. We conclude that this

amount should be the face value of the buy-out option: $50,000

per share, or in the case of Dopp's shares, $600,000. Under the

SSA, Pritzker could have exercised the buy-out option as late as

10 years after the formation of the contract (withholding any

payment until then). There is evidence in the record, through an

expert witness presented by Pritzker, that the prospect of so

long a delay would justify a somewhat lower figure, reflective of

a time-related discount. The expert testified that this

reduction to present value could have brought the present value

of the redemption price as of December 3, 1984, as low as

$114,638.

Thus, the jury could have found that, because of the wrongful

encumbrance, Dopp lost an asset worth $14,286,600, and, in lieu

thereof, was left with an asset worth no more than $114,638. On

these assumptions, a verdict for compensatory damages in the

amount of $14,171,962 is adequately supported by the evidence.

Beyond this amount, the jury's award is problematic.

We are unable either to explain the excess or to locate an

evidentiary hook on which it might be hung. The court below

tried justifying the added damages in the following manner:

In calculating the loss suffered by Dopp . .
., the jury need not have limited its
consideration to the actual value of Dopp's
unencumbered shares in HTP as of the date of
the breach of the Oral Contract. The jury
was required to determine Dopp's loss as of
the date of the breach; however, at that
moment Dopp's loss included the likelihood
that he would be deprived of any
participation in the future profits generated

28

by the properties. The jury could have taken
into account that a corporation which owns
world-class resort properties could
potentially generate considerable profits
profits which would be denied to Dopp . . . .
Like any investment, Dopp's shares had the
potential to make money or to lose money.
And they had this potential ad infinitum . .
. .

Dopp III, 831 F. Supp. at 945. In other words, the district

court visualized the premium added by the jury as representing

compensation for Dopp's share of the venture's profits from the

date of the verdict "back to December 3, 1984, the date of the

breach." Id.

In our view, the district court's reasoning is flawed.

While past profit potential may very well have been ascertainable

and quantifiable, there is no indication in the record that the

jury had before it specific evidence that would have allowed it

to engage in this kind of calculation. Thus, the inclusion of a

pro rata share of past profits as part of the verdict is

forbidden. Although juries generally enjoy broad latitude in

determining damages, their authority is not without all limits.

In the case of economic damages, in particular, the jury's award

must be rooted in an adequate evidentiary predicate. See Segal,

746 F.2d at 81; Kolb, 694 F.2d at 872. Since a thorough

canvassing of the trial record fails to unearth any such support,

we are constrained to conclude that the jury, in exceeding a

$14,171,962 figure, could not have done so on the basis of a

wrongful diversion of profits except by an impermissible resort

to speculation and surmise.

29

This conclusion is staunchly reinforced by the fact

that the judge's charge made no mention of Dopp's putative

participation in past profits. To the contrary, the judge

cautioned the jurors that even though "[y]ou have listened to

considerable evidence . . . which bears on the finances of the

Dorado Beach Hotel Corporation during the period following

Pritzker's breach of the oral contract on December 3, 1984 . . .

[f]or the purposes of assessing Dopp's damages, you must

disregard this evidence." It is a bedrock rule that juries must

act within the parameters of the court's instructions. See Sparf

& Hansen v. United States, 156 U.S. 51, 67 (1895). This rule has

particular pertinence where, as here, the instructions are crisp,

clear, and cogent. Thus, the district court's charge totally

undermines its later attempt to salvage the verdict.12

Dopp also tries to justify the excess portion of the

verdict on other grounds. His most forceful suggestion is that

the jury, in determining full damages, appropriately could have

considered the value of the management contract for the hotels

an asset worth, to Dopp's way of thinking, an additional

$35,200,000. He argues that, because Pritzker carved this



12There is perhaps another reason for rejecting the district
court's explanation: the necessity to safeguard against the risk
of duplicative recovery. After all, the expert valuations of
DBHC, such as the Merrill Lynch appraisal, already included
future profit projections. While we understand that the
projected profits included in those valuations may be
qualitatively distinguishable from the venture profits of which
the district court wrote, we also appreciate that a jury
overwhelmed by datum upon datum of economic estimations could
quite easily have conflated the two species of gains.

30

contract out of the deal despite the fact that it was part of

DBHC's inherent value, there is "ample evidence" to conclude that

"the $17 million jury's valuation of Dopp's full damages is, if

anything, too low by any standard." On close inspection,

however, Dopp's "ample evidence" proves no sturdier than the

proverbial house of cards.13

In our estimation, the management contract is wholly

irrelevant to the issue of full damages. As the parties

themselves expressly agreed in the oral contract, the management

contract was to be awarded to a Pritzker affiliate, not to either

Dopp or DBHC. Hence, the management contract bears no

relationship whatever to Dopp's damages or to the value of DBHC,

regardless of whether it may have constituted, as Dopp now

alleges, "a value inherent to [sic] Dopp's purchase-sale

contract."

We need go no further on the issue of full damages. We

hold that the jury's verdict is untenable to the extent that it

exceeds $14,171,962. Accordingly, we have no principled

alternative but to direct the district court to order a

conditional new trial for the sole purpose of redetermining full

damages, the condition being that if Dopp agrees to remit

$3,313,400 from the award, or, put another way, if he agrees to

accept a reduction of the "full damages" award to $14,171,962,


13Dopp also attempts to justify the jury verdict based on
"expectations of profit sharing and capital appreciation [that]
were destroyed by Pritzker's imposition of the buy-out clause."
This argument parallels the district court's rationale, and
founders for the reasons previously discussed.

31

then the verdict, as reduced, may stand. Should Dopp fail to

consent to such a remittitur, then the district court shall order

a new trial limited to the issue of full damages.14 Although

this remittitur is not insubstantial, we regard it as both

necessary and appropriate under the circumstances. See, e.g., K-

B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1162-63 (10th

Cir. 1985); Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435,

1448 (11th Cir.), cert. denied, 474 U.S. 1005 (1985); Dixon v.

International Harvester Co., 754 F.2d 573, 590 (5th Cir. 1985);

Irene D. Sann, Remittiturs (and Additurs) in the Federal Courts,

38 Case W. Res. L. Rev. 157, 188 (1987) (observing that, where

"the erroneously excessive portion of the jury verdict is a

liquidated amount that is, where the source of error is

identifiable and the measure of damages traceable to the error is

calculable . . . a remittitur of a small portion of the jury

verdict would be appropriate because the error can be identified

and corrected").

IV. OBSTINACY IV. OBSTINACY

Our final inquiry centers around the district court's

award of attorneys' fees ($1,500,000) and prejudgment interest

($6,843,379.42), based on its finding that Pritzker displayed

obstinacy. See Dopp III, 831 F. Supp. at 951 (citing P.R.R. Civ.



14If the issue of full damages is tried anew, then Dopp
shall again be afforded the opportunity, at the appropriate time,
to elect between full damages and annulment. If, however, Dopp
were to elect annulment, he would receive no accessory damages,
as we see no basis for disturbing the special finding of the jury
to this effect, see Dopp III, 831 F. Supp. at 942 n.5.

32

P. 44.1(d), 44.3(b)).15 Pritzker assigns error, arguing that

he was not obstinate within the meaning of the rules. We find

merit in Pritzker's plaint and nullify the awards. Hence, we do

not reach Dopp's contention that the court used too miserly an

interest rate.

A. Legal Principles. A. Legal Principles.

In a diversity case in which the substantive law of

Puerto Rico supplies the basis of decision, a federal court must

give effect to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules

of Civil Procedure. See, e.g., De Leon Lopez v. Corporacion

Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991). These

rules speak in imperatives. Thus, the imposition of attorneys'

fees and prejudgment interest is obligatory once a threshold

finding brings the rules into play. See Fernandez v. San Juan



15Rule 44.1(d) provides in relevant part:

In the event any party or its lawyer has
acted obstinately or frivolously, the court
shall, in its judgment, impose on such person
the payment of a sum for attorney's fees
which the court decides corresponds to such
conduct.

P.R. Laws Ann. tit. 32, app. III R.44.1(d) (1984 & Supp. 1989).
With certain exceptions not applicable here, Rule 44.3(b)
provides that:

[T]he court will . . . impose on the party
that has acted rashly the payment of interest
. . . from the time the cause of action
arises in every case of collection of money
and from the time the claim is filed in
actions for damages until the date judgment
is pronounced. . . .

P.R. Laws Ann. tit. 32, app. III R.44.3(b) (1984 & Supp. 1989).

33

Cement Co., 118 D.P.R. 713 (1987). The two rules operate

differently, however, in at least one salient respect: while

Rule 44.3(b) provides for determining the amount of prejudgment

interest in a mechanical fashion, specifying the period for which

interest is to be imposed and the interest rate to be used, Rule

44.1(d) vests the court with considerable discretion in

determining the amount of attorneys' fees to be bestowed.

A threshold finding of obstinacy brings both rules into

play. To be sure, the rules themselves use slightly disparate

terminology in describing the prerequisites to their operation.

Rule 44.1(d) speaks of parties who act "obstinately"; the

official translation of Rule 44.3(b) speaks of parties who act

"rashly"; and the official Spanish version of Rule 44.3(b) uses

the word "temeridad" a term that "is more appropriately

translated as `temerity,'" Dopp III, 831 F. Supp. at 951 n.9. We

regard these linguistic differences as inconsequential, for the

case law makes it transpicuously clear that the legally operative

conduct under both rules is that of obstinacy. See De Leon

Lopez, 931 F.2d at 126-27 (citing other cases); see also

Fernandez, 118 D.P.R. 713 (noting that interest and attorneys'

fees will both be assessed "when the losing party has been

obstinate"). We hold, therefore, that obstinacy is the linchpin

of a determination under both Rule 44.1(d) and Rule 44.3(b). The

court below, which equated rashness and temerity with obstinacy,

see Dopp III, 831 F. Supp. at 951 n.9, thus employed the proper

standard.

34

The rudiments of obstinacy are more or less

straightforward:

A finding of obstinacy requires that the
court determine a litigant to have been
unreasonably adamant or stubbornly litigious,
beyond the acceptable demands of the
litigation, thereby wasting time and causing
the court and the other litigants unnecessary
expense and delay.

De Leon Lopez, 931 F.2d at 126; accord La Playa Santa Marina,

Inc. v. Chris-Craft Corp., 597 F.2d 1, 7 (1st Cir. 1979); Rivera

v. Rederi A/B Nordstjernan, 456 F.2d 970, 975 (1st Cir.), cert.

denied, 409 U.S. 876 (1972); Soto v. Lugo, 76 P.R.R. 416, 419

(1954). The purpose behind the rules is to penalize "a losing

party that because of his stubbornness, obstinacy, rashness, and

insistent frivolous attitude has forced the other party to

needlessly assume the pains, costs, efforts, and inconveniences

of a litigation." Fernandez, 118 D.P.R. 713; see also Reyes v.

Banco Santander de P.R., N.A., 583 F. Supp. 1444, 1446 (D.P.R.

1984).

In fine, the rules are aposematic in the first

instance, and, if their warnings are not heeded, the resultant

imposts are intended to punish the offending party as well as to

recompense those who are victimized by the offender's

recalcitrance. Consequently, under the rules at issue here,

attorneys' fees and prejudgment interest cannot be imposed merely

to reward a successful litigant; rather, such premiums are

payable only if the offending party's behavior "result[s] in a

litigation that could have been avoided"; or if the behavior

35

"prolongs [the litigation] needlessly"; or if it "obliges the

other party to embark on needless procedures." Fernandez, 118

D.P.R. 713 (citations omitted).

B. Standard of Review. B. Standard of Review.

The very nature of a trial judge's interactive role

assures an intimate familiarity with the nuances of ongoing

litigation a familiarity that appellate judges, handicapped by

the sterility of an impassive record, cannot hope to match. The

standard of appellate review often recognizes this disparity. So

it is here: "[w]e review the trier's determination of whether a

party has been obstinate in a deferential manner, using an abuse-

of-discretion approach." De Leon Lopez, 931 F.2d at 127; accord

Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 7 (1st

Cir. 1992); Marshall v. Perez Arzuaga, 828 F.2d 845, 852 (1st

Cir. 1987), cert. denied, 484 U.S. 1065 (1988).

We have fashioned a framework for gauging claimed

abuses of discretion:

In making discretionary judgments, a district
court abuses its discretion when a relevant
factor deserving of significant weight is
overlooked, or when an improper factor is
accorded significant weight, or when the
court considers the appropriate mix of
factors, but commits a palpable error of
judgment in calibrating the decisional
scales.

United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992); accord

Foster v. Mydas Assocs., Inc., 943 F.2d 139, 143 (1st Cir. 1991);

Independent Oil & Chem. Workers of Quincy, Inc. v. Proctor &

Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

36

As its language suggests, the abuse-of-discretion

framework constitutes a substantial obstacle for appellants who

consider themselves aggrieved by discretionary decisions of the

district court; most such appellants are destined to leave this

court empty-handed. This is as it must be, especially in light

of the vastly different relationships between the district court

and the events of an actual trial, on the one hand, and the court

of appeals and those same events, on the other hand. This is not

to imply, however, that an appellate tribunal may merely rubber-

stamp a district judge's discretionary determinations. Though

abuse of discretion is a relatively relaxed standard of review,

it is a standard nonetheless, and the court of appeals will

interject itself if the trial court does not meet its measure.

C. Analysis. C. Analysis.

The court below cited three occurrences in support of

its finding of obstinacy: (1) the deceit and duress found by the

jury in the first trial to have been practiced by Pritzker during

the early stages of his dealings with Dopp; (2) Pritzker's appeal

from the verdict rendered by the first jury; and (3) Pritzker's

steadfast claim that Dopp's full damages amounted to no more than

$35,000. See Dopp III, 831 F. Supp. at 951. We think it is

evident from this account that the district court lost its way.

In the pages that follow, we set forth our rationale.

Perhaps most important, there is no sign that the court

factored into the decisional calculus the overall nature of the

litigation, or that it placed Pritzker's conduct within the

37

context of the case as a whole. Prosopopoeially speaking, each

case, like each individual, has a personality distinct from that

of all others. A case's personality is important in evaluating

claims of obstinacy because, just as obstinacy may be found to

characterize a party's conduct at one stage of a particular case

but not necessarily at another, see Carrillo v. Sameit Westbulk,

514 F.2d 1214, 1220 (1st Cir.), cert. denied, 423 U.S. 1014

(1975), so may obstinacy be found to characterize a particular

form of conduct in one case but not in another. In making a

determination of obstinacy under P.R.R. Civ. P. 44, therefore, it

is wise for the trier to take into account the case's

personality.16 This course becomes imperative when the court

is confronted with a case that has a highly distinctive

personality.

This is such a case. The district court described it

as involving "difficult and protracted legal battles." Dopp III,

831 F. Supp. at 940. This understates the matter. Here, the

stakes are high, the issues tangled, the law tenebrous, and the

litigants relentless. The nature of the performance sought and

the multiplicity of parties and interests contribute to the


16Our own precedents afford a testament to the importance of
correctly characterizing the nature of the litigation for the
purpose of discerning obstinacy. In La Playa Santa Marina, a
dealer sued a manufacturer. Following a bench trial, the
district court found the manufacturer liable for damages, 597
F.2d at 3-4, and, in addition, awarded attorneys' fees due to the
manufacturer's "obvious temerity in the defense of this suit."
Id. at 7. We reversed the fee award, observing that the
underlying dispute was one characterized by "close questions and
sharp conflicts in the evidence on both liability and damages."
Id.

38

case's uniqueness. In view of these realities, we are of the

opinion that the trial court had an inescapable obligation to

gauge the culpability of Pritzker's conduct accordingly. In

failing to undertake such an evaluation, the district court

abused its discretion.

We believe that the court compounded this error of

omission by slipping into various errors of commission. In the

first place, the court used too wide a temporal horizon.

Obstinacy depends on a party's conduct in the course of

litigation. See, e.g., De Leon Lopez, 931 F.2d at 126

(indicating that the rules prohibit obstinacy "during the course

of a lawsuit"). Thus, the fact that Pritzker practiced deceit

and duress during the events antecedent to the litigation could

not trigger Rule 44.

In the second place, we do not believe that, in the

circumstances of this case, Pritzker's appeal from the first

jury's verdict constituted sanctionable conduct. The district

court thought that it was proper to penalize Pritzker for taking

the appeal because he "thereby caus[ed] significant additional

expenditures by the plaintiff, only to have the amount of the

verdict against him increased by the second verdict." Dopp III,

831 F. Supp. at 951. We find such a conclusion indefensible in

light of the appeals simultaneously taken by Dopp and several

other parties from the first jury verdict; the fact that

Pritzker's appeal succeeded at least in part, prompting us to

erase the original remedial scheme and to order a partial new

39

trial; and, finally, the uncertainty and complexity that

surrounded the issue of Dopp's entitlement vel non to resolution.

This last point is especially significant because, as a

general rule, litigation of a novel but colorable claim cannot,

by itself, provide the basis for a finding of obstinacy under

P.R.R. Civ. P. 44. See, e.g., Riofrio Anda v. Ralston Purina

Co., 772 F. Supp. 46, 54 (D.P.R. 1991) ("[W]here, as here, novel

issues are raised, a party cannot be held as obstinate."), aff'd,

959 F.2d 1149 (1st Cir. 1992); Marina Indus., Inc. v. Brown

Boveri Corp., 114 D.P.R. 64 (1983) (similar); Brea v. Pardo, 113

D.P.R. 217 (1982) (similar). Indeed, even if a party's claim

ultimately fails, it cannot be deemed frivolous or obstinate for

that reason alone. See Navarro de Cosme v. Hospital Paiva, 922

F.2d 926, 934 (1st Cir. 1991); Reyes, 583 F. Supp. at 1445; Felix

v. Victory Carriers, Inc., 342 F. Supp. 1386, 1388 (D.P.R. 1972).

Such a rule is dictated by both common sense and common fairness.

Obstinacy must be judged primarily as of the time the conduct is

undertaken, not in hindsight;17 and penalizing a party for

filing a non-frivolous appeal for no other reason than that the

party's position deteriorated, rather than improved, in

consequence of the appeal is a paradigmatic misuse of discretion.

Finally, we are doubtful that Pritzker's myopic

assessment of Dopp's full damages at $35,000 constituted conduct



17That is not to say, however, that a court must close its
eyes to subsequent events, for such events sometimes can cast
light on what a party knew, or should have known, at the time he
acted.

40

violative of Rules 44.1(d) and 44.3(b). Though we readily

acknowledge that Pritzker's stated valuation verges on the

ludicrous, there is nothing to show that Dopp who even now

challenges a $17,000,000 verdict as too paltry, see supra Part

III ever placed a more reasonable value on the case, or that a

realistic settlement offer by Pritzker would have satisfied Dopp

and shortened the proceedings.18

To sum up, this case in its present posture epitomizes

the potential risk of overapplication associated with Puerto

Rico's obstinacy rules. See Carrillo, 514 F.2d at 1219-20.

Because the district court's subsidiary findings do not support

its ultimate finding of obstinacy, and because the record does

not otherwise show that Pritzker was "unreasonably adamant or

stubbornly litigious, beyond the acceptable demands of the

litigation," De Leon Lopez, 931 F.2d at 127 (emphasis supplied),

we have no choice but to vacate the award of attorneys' fees and

prejudgment interest.

V. CONCLUSION V. CONCLUSION

This case has taken on a life of its own. Perhaps its

duration is directly proportional to the imputed value of the

assets at stake, but, whether or not esurience is the cause of

the prolongation, old age inevitably overtakes cases as well as


18Although Dopp's apparent intractability does not in any
way justify Pritzker's seeming intransigence two wrongs do not
make a right an obstinacy determination must necessarily take
the whole picture into account. After all, courts have long
believed that, in assaying such matters, "[t]he lemon should not
be allowed to reap a reward for calling the grapefruit sour."
Quinones-Pacheco, 979 F.2d at 8 n.9.

41

people. Although we are unable fully to inter the corpus of the

litigation today, we have done what we can to move the case

toward its final resting place.

For the reasons discussed, we affirm the district

court's denial of a resultory remedy; conditionally affirm the

award of full damages, subject to a remittitur (or,

alternatively, a limited new trial) as described in Part III(B),

supra; and reverse the award of attorneys' fees and prejudgment

interest.19

Affirmed in part, reversed in part, and remanded to the Affirmed in part, reversed in part, and remanded to the

district court for further proceedings consistent with this district court for further proceedings consistent with this

opinion. Mandate shall be stayed for the time being, and shall opinion. Mandate shall be stayed for the time being, and shall

issue simultaneous with the issuance of mandate in respect to the issue simultaneous with the issuance of mandate in respect to the

three consolidated appeals, namely, Nos. 93-2374, 94-1128, and three consolidated appeals, namely, Nos. 93-2374, 94-1128, and

94-1129, that are to be the subject of a separate and subsequent 94-1129, that are to be the subject of a separate and subsequent

opinion. Each party shall bear his own costs. opinion. Each party shall bear his own costs.



19To the extent that the parties to these appeals have
raised other arguments, some are rendered moot by our rulings,
and others are patently meritless. In any event, none requires
particularized discussion.

42